UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| NEIL T. LARSON,<br><br>Plaintiff,<br><br>vs.<br><br>ANDREW SAUL, Commissioner of the<br>Social Security Administration;<br><br>Defendant. | 4:18-CV-04121-VLD<br><br>MEMORANDUM OPINION<br>AND ORDER |

## INTRODUCTION

Plaintiff Neil T. Larson seeks judicial review of the Commissioner's final

decision denying his application for disability insurance benefits under Title II

and supplemental security income under Title XVI of the Social Security Act.[1]

---

[1]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits
are sometimes called "Title II benefits." Receipt of both forms of benefits is
dependent upon whether the claimant is disabled. The definition of disability
is the same under both Titles. The difference--greatly simplified--is that a
claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage"
status (calculated according to one's earning history), and the amount of
benefits are likewise calculated according to a formula using the claimant's
earning history. There are no such "coverage" requirements for SSI benefits,
but the potential amount of SSI benefits is uniform and set by statute,
dependent upon the claimant's financial situation, and reduced by the
claimant's earnings, if any. Title II benefits may include a 12-month period of
benefits retroactive to the date of application; Title XVI benefits are not
retroactive to the application date. SSR 83-20. There are corresponding and
usually identical regulations for each type of benefit. See e.g. 20 C.F.R.
§ 404.1520 and § 416.920 (evaluation of disability using the five-step
procedure under Title II and Title XVI). In this case, Mr. Larson filed his
application for both types of benefits. AR225, 232. His coverage status for

Mr. Larson has filed a complaint and now moves to reverse the Commissioner, requesting the court to reverse the Commissioner's final decision denying him disability benefits and to grant an award of benefits outright without remanding to the agency. In the alternative, Mr. Larson seeks an order reversing and remanding to the agency for a *de novo* hearing.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g). The parties have consented to this magistrate judge resolving the case pursuant to 28 U.S.C. § 636(c). Based on the facts, law and analysis discussed in further detail below, the court remands for further consideration at the agency level by the Commissioner.

## FACTS[2]

### A.    Statement of the Case

The record shows Mr. Larson filed prior Social Security disability claims in January 2005, June 2008, and June 2009. AR103. On November 18, 2010, an ALJ denied Mr. Larson's claims from 2009. AR65-75. Mr. Larson did not appeal the ALJ's unfavorable decision on November 18, 2010. AR264.

This current claim begins with Mr. Larson's filing for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on May 25,

---

SSD benefits expired on December 31, 2012. AR721. In other words, in order to be entitled to Title II benefits, Mr. Larson must prove he was disabled on or before that date.

[2] These facts are gleaned from the parties' stipulated statement of facts (Docket 13). The court has made only minor grammatical and stylistic changes.

2011, alleging disability since August 15, 2007.  AR225, 232.  The state agency denied his claim on July 26, 2011, (AR25) and after reconsideration on March 12, 2012.  AR132, 135.  The case went to hearing before an administrative law judge ("ALJ") on March 20, 2013.  AR10.

On April 2, 2013, the ALJ denied the claim.  AR20.  Mr. Larson requested Appeals Council review, submitting additional medical evidence.  AR314-18.  On August 21, 2014, the Appeals Council made the evidence part of the record (AR4) but "found no reason under our rules to review the Administrative Law Judge's decision ... This means that the [ALJ's] decision is the final decision of the Commissioner ...."  AR1.[3]

Mr. Larson was born in 1970.  AR225.  He was adopted at three weeks of age.  AR556.  Circumstances of his birth and congenital defects are noted at AR359, 511, 514, 556 and elsewhere in the record.  He grew up on a farm near Beresford.  AR399.  He felt that he did not fit in at home or at school and was teased and bullied all his life.  AR398, 556.

Mr. Larson was 1.5 credits short of the number needed to graduate from high school and has a general equivalency degree ("GED").  AR556.  He started but dropped out of a course in architectural drafting and building construction

---

[3] This footnote is added by the court.  After the Appeals Council denied review in 2014, Mr. Larson sought review from the federal district court.  See Civ. No. 14-4157-RAL (D.S.D.).  Mr. Larson's case was remanded to the Social Security Administration for further proceedings.  AR928-57.  After receiving further evidence, including another ALJ hearing, on January 31, 2017, the SSA again denied Mr. Larson's claim.  AR721-36.  On August 9, 2018, the Appeals Council again denied review.  AR573-581.  Then Mr. Larson sought this (second) review of his 2011 claim for benefits in federal district court.

at Mitchell Technical Institute. AR399, 1197. He started an electromechanical technology course at Southeast Technical Institute, dropping out in 1994. Id.

After technical school, Mr. Larson went to work for Tomacelli's Pizza. AR277. During the next 13 years, he worked mainly as a pizza-delivery driver, typically part-time, often holding two jobs. AR269, 243-45. From 1995-2000, he worked for Little Caesar's. AR269, 277. He worked for Denucci Pizza from 1997-99. AR269, 277. In 1999-2000, he painted commercial grain dryers. AR277, 284. From 2000-04 he worked for Papa John's Pizza. AR277. From 2004-06, he worked for Quiznos, a sandwich shop. AR277, 1998. At the same time he worked for Pizza Hut. AR244-45, 277. In 2007 he worked part-time for Pizza Hut. AR245, 269.

Mr. Larson has not worked since 2007, except for taking people to their appointments one or two hours per month. AR40, 277, 723, 789-90, 1157, 1165, 1167, 1178, 1180.

Mr. Larson did not know his family medical history. AR326, 514. He was born "with eyes pointing out," had surgery and still had a lazy left eye. AR514, 539. He gave inconsistent dates of surgeries: an undescended left testicle was repaired in 1978 or 1983 (AR511, 514); in 1992 or 1993 he had left orchiectomy for testicular cancer. AR511, 514.

**B.   Medical Evidence**

**1.   Medical Evidence Pre-2009**

Mr. Larson was seen at the Avera emergency room on November 14, 2007, not feeling well; his initial blood sugar level was 409. AR1669. After he

was given insulin, his blood sugar level dropped "218, adequately controlled." AR1669.

Mr. Larson was admitted to Avera through the emergency room on September 19, 2008, for acute poorly controlled diabetes, hyperglycemia with blood sugars running high the last six weeks despite his attempts to control the level with insulin and diet modification. AR1651, 1658. His blood sugar was 424 on the day of admission, and his liver function tests were elevated. AR1651. The emergency room staff requested a psychiatric consult, but Mr. Larson asserted he had no problems with anxiety or depression. AR1651. Mr. Larson also reported episodic tingling sensations in his fingers and feet. AR1652. A noninvasive Doppler was obtained of Mr. Larson's right leg due to pain which revealed insufficiency right posterior tibial with superficial varicosities in the right calf, has flow when compressed, low probability for clotting. AR1660. Mr. Larson was discharged on September 22, 2008, but the discharge report was not included in the Avera records. AR1655, 1663-65.

### 2.    Medical Evidence 2009

Mr. Larson received medical care at Falls Community Health ("Falls Clinic"), where he reported being a patient since 1992. AR273. On November 27, 2009, he was on TriCor22, Flonase, Actos, Cozaar, two kinds of insulin (regular and NPH pork), and Crestor. AR361. On December 29, 2009, he had multiple allergies, home glucose readings that ran 140-150, and a record of elevated blood pressures. AR358. Mr. Larson reported he felt "well." AR358. He had peripheral vascular disease, varicose veins, diabetes, "trouble with his

knees and back," and migraine headaches "where he loses mental and visual focus." AR359. In December 2009, his blood pressure was 146/108, and diabetes was uncontrolled and uncomplicated. AR359-60.

### 3. Medical Evidence 2010

In January, Mr. Larson treated at Falls Clinic and advised that he was "going to get back on diet and dailey [sic] exercise to try to bring sugars down." AR358. In July, Judy Jacobsen, Falls Clinic physician assistant, prescribed Trazodone for Larson's inability to sleep more than one to four hours at night. AR351-52. She recorded complaints of radiating low back pain, with little relief from chiropractic care. AR356-46. She noted difficulty rising from a sitting position. AR346. The glucometer reported blood sugars from 60-400. Blood pressures were high. Id. Ms. Jacobsen noted Mr. Larson had run out of and was not taking his blood pressure medication, and he was not working on exercising. AR351. In December, triglycerides, Glucose, BUN, Creatinine, and A1C were elevated. AR362-63.

### 4. Medical Evidence 2011

In March 2011, Wallace Fritz, M.D., at Falls Clinic noted three to five blood sugar checks daily and "runs from 70-400. At waking, 140; fluctuates after meals. … Has trouble sleeping, insomnia, restless leg syndrome, OSA, has multiple complaints of neighbors being loud etc that cause him to be unable to sleep. He does not follow sleep hygiene and has tried both trazedone and ambien with minimal results. Resistant to any change suggested." AR341. He has dyspnea that Larson said was due to lack of exercise. Id. Habits were "not

exercising regularly, exercising erratically, and sedentary tries to walk daily, 15 minutes. Goes to Walmart 1-2 weekly for exercise." AR342. He felt "tired or poorly." Id. Assessment: "Primary diagnosis of type 2 diabetes uncomplicated, controlled, Hypertension, Hyperlipidemia, and Type 2 diabetes – uncomplicated, uncontrolled." AR343. Dr. Fritz recommended ACE inhibitors and HMGCoA reductase inhibitors, and he added Hydroclorothiazide$_{30}$-Lisinopril 12.5 mg-20 mg, and Lisinopril 20 mg to Larson's regimen. Id. Ambien could be considered for insomnia if available on the PAP. Id.

On April 26, 2011, Mr. Larson sought treatment at Sanford Medical Center emergency room for chest tightness, mild shortness of breath and palpitations "after eating a large lunch with beans." AR326. Hannah Hall, M.D., recorded: "Patient states that normally he develops some chest discomfort and palpitations described as a fast and strong heart beat after eating but that they normally only last a few minutes .... He also complains of feeling dizzy ... similar to when his blood sugar runs low...." However, he had checked his blood sugar and it was 119. Id. He said his heart rate was usually in the upper 90s to 100s but on this day was in the 120s. Upon arrival, chest pain had resolved; dizziness and nausea persisted. Id. The patient was on two kinds of insulin plus Pioglitazone, two statins and two antihypertensive medications. AR327. He had gained 40 pounds in the last year. Id. He weighed 280 (BMI 41.35). AR328. Mr. Larson stated "his blood sugars are well controlled and he can easily feel his lows." AR328. The ECG was "borderline" with heart rate 126 (tachycardia), probable left atrial abnormality, borderline T-

wave abnormalities in the inferior leads, T-wave abnormalities involving the lateral leads, and isolated Q wave in III. AR323. The laboratory reported elevated blood urea nitrogen (BUN) and D-dimer. AR329-30. Glucose and Troponin POC were normal. AR332. "[C]ardiac risk factors include[d] HTN, DM, dyslipidemia and obesity." AR330. Computerized tomographic angiography (CTA) of the chest ruled out pulmonary embolism. AR320. Mr. Larson did not want a cardiology referral ...." AR330. The plan: "Discharge to home. Call FCH [Falls Community Health] for prompt follow-up and to discuss options for further cardiac evaluation ...." Id.

On April 28, 2011, Dr. Fritz noted Mr. Larson "had a negative cardiac workup and eventually a CTA which was negative. Feeling better now but continues to have some left shoulder pain, which he feels is secondary to sleeping on it wrong and some mild dizziness, although this is improved." AR338. Blood sugars ranged from 150-250 and occasionally went to 400. Id. He could "somatically feel" sugar changes and manage them with insulin and rechecking his blood sugar. Id. Blood pressure was 148/100 and 146/98; he weighed 293. AR339. His A1C was 8.8. AR339, 367. Dr. Fritz diagnosed "uncomplicated, controlled" type 2 diabetes and lower back pain; he offered no new treatment plan. AR339.

On June 29, 2011, Dr. Fritz said glucometer readings ranged from the 60s to 450s. AR368. Mr. Larson had difficulty sleeping even on Ambien and Trazodone: "Sometimes will sleep for 12-15 hours straight and then other days 2-3 is all he gets for the day. Is not very active at all." Id. He weighed 300

pounds.  Id.  Dr. Fritz adjusted Mr. Larson's insulin, recommended Melatonin for sleep, discussed sleep hygiene, and encouraged Mr. Larson to increase his activity.  AR369.

On August 14, 2011, Mr. Larson sought ER treatment for headache, dizziness, and chest discomfort with shortness of breath.  He thought he got these symptoms with elevated blood pressure; it was 167/87.  AR393-94.  He told CNP Augspurger that "normal BP is 160s."  AR393.  He had shortness of breath, chest discomfort, dizziness and headaches.  AR394.  He reported no musculoskeletal problems.  AR394.  Physical exam was normal, and the ECG showed "significant rhythm changes," severity "normal."  AR395.  He did not see a physician, and a cardiology referral was completed.  Id.

On August 19, 2011, Mr. Larson saw Ms. Jacobsen.  AR370.  She noted the ER visit for chest pain and dyspnea.  AR370.  HGMs were 50-350, and cardiology workup was scheduled.  Id.  He was "feeling tired or poorly," had urinary frequency and nocturia.  Id.  He weighed 285 pounds.  Id.  He had insomnia.  Diabetes was "uncomplicated, controlled."  AR371.  The lab reported A1C of 9.2.  AR367.  Ms. Jacobsen wrote a letter telling Mr. Larson to increase insulin to 60 units in the morning and 40 in the evening, and "have cardiologist send us MRs."  AR371.

On August 24, 2011, Mr. Larson's nuclear stress test was negative.  AR381.  The 2-D echocardiogram revealed mild left ventricular hypertrophy, mildly enlarged left atrial chamber, probably enlarged right atrial chamber,

trace of tricuspid regurgitation, mild pulmonary hypertension, and ejection fraction of 65 percent.  AR384.

On October 9, 2011, Mr. Larson presented to the emergency room. AR377.  Christopher J. Carlisle, M.D., noted "Pt with very depressed affect called an ambulance for anterior c/p of 2h duration.  He's been w/u through myoview stress test to date with neg results ... [H]e ... thinks it might be stress related and ... this is what he was told after his stress test last month."  Id. Dr. Carlisle noted Mr. Larson's ECG was unremarkable.  AR378.  Assessment: "Ongoing problems with [chest pain], possibly due to anxiety; no evidence of cardiac [disease].  [Patient] seems resigned to this; almost matter-of-fact in discussing it."  AR378.

### 5.    Medical Evidence 2012

In April, 2012, Mr. Larson presented at the hospital with "generalized shakes today after waking up this morning.  Patient states he drank a lot of caffeine last night and this morning found blood sugar to be markedly elevated."  AR406.  He did not take his insulin but came to the emergency room.  AR406.  He denied chest discomfort but felt "a little sob which is also typical for him with these episodes. He thinks he just drank too much coffee." Id.  Physical and neurological exams were normal.  AR406-07.  The ECG was negative.  Chest x-ray showed "mild CM" (AR407), unchanged from April 2011 AR413.  Glucose was 326.  AR407.  The patient declined further workup, was anxious to go home and was discharged.  AR408.

On October 19, 2012, Mr. Larson was hospitalized for diabetic ketoacidosis.  AR421.  He presented with nausea, vomiting and lightheadedness.  AR415.  He told Christopher Wong, M.D.: "he gets like this every couple months … usually associated [with] high or low sugars."  Id.  He took six units of insulin after finding his sugar was 292; it helped.  He checked his blood pressure (170/112) and pulse (126).  Id.  He reported mild chronic shortness of breath, nausea, lightheadedness, and chronic low back pain.  AR415-16.  Darren Manthey, M.D., evaluated Mr. Larson and said he had intermittent chest pressure, was tremulous, anxious, and tachycardic.  AR419.  "My initial assessment … established that Neil Larson has DKA [diabetic ketoacidosis], which requires immediate intervention … [H]e is critically ill."  AR421.  An ECG showed sinus tachycardia and significant rhythm changes.  AR417, 419, 445.  The lab reported elevated WBCs (abscessed tooth was diagnosed after admission) (AR429-30), Glucose (364), BUN (22), and Anion gap (24).  AR417.  Chloride and $CO_2$ were decreased.  AR419-20.  His eGFR was 77 initially (AR441) and rose to 90.  AR440.  Hypertriglyceridemia was present.  AR436.  Acetone (serum ketones) was elevated at 1.58.  AR440.  Thane Gale, M.D., recorded a "long history of awakening from sleep with SOB and tachycardia, easily falls asleep in daytime."  AR430.  The patient used smokeless tobacco and drank about 120 ounces of alcohol a week.  AR431.  Blood pressure was 151/97, pulse 102, weight 190, and O2 saturation 92%.  AR432.  Physical exam was normal and the patient was alert and oriented.  AR431.  Diagnoses:  Diabetic ketoacidosis – causing nausea, vomiting and

lightheadedness; hypertension; questionable sleep apnea; and hypertriglyceridemia with history of pancreatitis.  AR436.  The Pulmonary Function Lab found intermittent sleep desaturations, and recommended polysomnography if clinically indicated.  AR444.

On October 23, 2012, Mr. Larson was discharged by Tara Geis, M.D.  AR422.  Mr. Larson was provided diabetic information sheets that explained that being sick could raise blood sugar.  Signs and symptoms of low blood sugar, or hypoglycemia:  shaky, fast heartbeat, sweaty, dizzy, anxious, hungry, blurry vision, weak or tired, headache, nervous or upset.  Signs and symptoms of high blood sugar, or hyperglycemia: blurry vision, weak or tired, increased thirst, increased hunger, and urinary frequency.  AR424-25.  Dr. Geis advised that Mr. Larson could "[r]esume normal activity" upon discharge.  AR424.

On December 28, 2012, Mr. Larson was hospitalized.  AR465.  He had "very vague complaints, mild chest discomfort, difficulty breathing, rapid heart rate, lightheadedness for 2 days but worsening during his episodes of dyspnea, feeling very fatigued."  AR469-70.  He reported night sweats, nightmares, and insomnia.  AR470.  He had slept an hour the night before, began having vague chest complaints at about 1 pm, "but was fine doing activities around his house ...."  AR470.  "Patient has poorly controlled DM, on insulin, A1C is usually around 9.5 .... Has had multiple bouts of DKA [diabetic ketoacidosis] ... and has been in the ICU for pancreatitis in the past."  Id.  He had "anxiety which he admits could be playing a role in this."  His O2 saturation was 91 percent with heart rate in the 110s.  Id.  Review of systems was positive for

12

fatigue, night sweats, sleep disturbance, anxiety, shortness of breath and wheezing, chest pain and palpitations, dizziness. AR470-71. On physical exam, peripheral pulses were reported as both "normal" and "diminished." Varicosities were present. AR479. Laboratory abnormalities were consistent with his typical pattern. AR472-73. But D-dimer and troponin I were elevated. AR487. The ECG showed sinus tachycardia. AR475. The CTA revealed thyroid abnormality, fatty liver with calcified lung nodule, and gallbladder calculi. AR490. Mark List, M.D., "considered that this is simply anxiety/panic attacks but with elevation of troponin and risk factors needs further workup." AR475. Because of his history of DVT and elevated D-Dimer, "will check bilateral LE dopplers." The patient "does not appear to be in DKA although wonder about chronicity of acidosis with compensation." AR476. During Mr. Larson's first night in the hospital, Glucose was critically elevated at 439. AR485. At 02:55 hours, Glucose persisted at 415. BUN was elevated at 29. AR485.

The next day, December 29, 2012, Mr. Larson had a cardiology consult with Tomasz Styz, M.D. AR452. He had a history of "rest cp suggestive of unstable angina, ECG with subtle changes, enzymes negative." Id. He had Troponin elevation. The patient described chest discomfort with shortness of breath the day before. He thought it was an insulin reaction but it wasn't. Id. "He did have a negative stress test about 1 year ago. He is sedentary and very limited functionally by back pain. States he has trouble standing for periods of time due to pain in back and leg swelling." Id. Cardiac risk factors included

"DM (since pancreatitis in 2002), HTN and dyslipidemia." Id. He drank about 120 ounces of alcohol per week. AR453. On review of systems, Mr. Larson had "++ cough," "++ shortness of breath," and chest discomfort or mild dyspnea on exertion. AR454. On physical exam he appeared anxious. He had diminished peripheral pulses in both feet and varicosities. Id. The laboratory reported abnormal white cells, Glucose 232 and BUN 29. AR454-55. Since he could not "walk on T due to significant back issues," he would have a "lexi stress" test. AR455. Before Lexiscan injection, he had nonspecific ST-T changes; these did not change during the injection. Resting left ventricle ejection fraction was 56 percent; the stress "LV EF" was 52 percent. AR458, 507. During the injections he reported "[n]o symptoms suggestive of angina." AR507. The study was "equivocal." Perfusion images demonstrated a small defect involving the apical wall(s) that appeared partially reversible. AR458. Venous Doppler studies revealed an "incompetent 88 ms GSV Junction," diagnosed as superficial venous insufficiency in the right lower extremity. AR460. Orvar Jonsson, M.D., ordered lab studies. AR483. Larson's eGFR was low at 57. BUN and Creatinine were elevated. AR483. Dr. Jonsson ordered cardiac catheterization with possible angioplasty. AR481, 482. Cardiac catheterization and angiogram were accomplished on December 31, 2012. AR494-95. Thomas Stys, M.D., reported findings: the LAD (left anterior descending artery) had 30 percent stenosis of the mid LAD and diffuse, up to 80 percent, stenosis of "small vessel distal LAD." There was 30 percent ostial stenosis of the circumflex and 20 percent distal stenosis of the right coronary

14

artery.  AR495-96.  Dr. Stys diagnosed "Small vessel disease."  AR496.  He

recommended medical therapy.  AR502.  Tracy Davies, M.D., wrote the

discharge summary, noting "multiple risk factors for heart disease including

uncontrolled diabetes, hyperlipidemia, and obesity."  AR465.  "Cath showed

stenosis of smaller lateral vessels and no stenting was performed."  She noted

"multiple bouts of DKA over past couple of years and has been in the ICU for

pancreatitis in the past."  AR468.  She said hypertension was moderately well

controlled on lisinopril and HCTZ, and high cholesterol was "well controlled on

Statin."  Id.  In the same note, Dr. Davies stated "Hyperlipidemia with

triglycerides >600.  Mr. Larson is already on the max dosing of Crestor and

Tricor.  He states he is compliant … [T]his is a significant risk factor for cardiac

disease and his medications are optimized, so he needs to change his diet.

Again, this was met with much resistance and many excuses."  AR466.  He was

unwilling to stop drinking.  Fish oil would be added to his medications and the

primary care provider could make further changes.  AR466.  Dr. Davies talked

to Mr. Larson about his cardiac risk factors.  His "excuses" were "mostly

related to money and agoraphobia" as to why he could not change his diet or

exercise.  AR465.  Discharge diagnoses on December 31, 2012, were chest

pain, right lower lobe pneumonia, diabetes mellitus, hypertension,

hyperlipidemia, and GERD.  AR465.

### 6.    Medical Evidence 2013

On January 14, 2013, Ms. Jacobsen recorded ongoing back pain and the

patient's statement that chiropractic treatment helped for "only a day

anymore." AR462. She noted muscle spasm. "No money for MRI which we discussed on a previous visit. Pain radiates down both legs and both legs will feel numb." Id. Regarding his recent hospitalization, she stated "Cardiology work up good." Id. His musculoskeletal system was "normal," he was able to twist his torso, and he had no neurological deficits. AR463. She renewed Naproxen and said he should exercise more. Id.

Mr. Larson was seen at the Physicians Vein Clinic in July, 2013, for some "significant" symptoms in the veins of both legs. AR1421. Treatment was delayed due to lack of insurance. AR1421.

In October, 2013, James Dickerson, Ph.D., administered a battery of tests during neuropsychological evaluation, including Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV) Wide Range Achievement Test 4 (WRAT 4), Wechsler Memory Scale-Fourth Edition (WMS-IV) and Halstead-Reitan Neuropsychological Battery. AR558. The evaluation started at 9:00 a.m. and lasted until 7:00 p.m. and included a one-hour clinical psychological/psychiatric interview. AR559. He found much variability in Mr. Larson's scores. AR59-60. Processing speed was 4th percentile. AR559. "This extremely low score is attributed to two scores … involving hand-eye coordination." Id. He was an "impaired verbal learner," in the second percentile, which is important because "most learning on the job is given verbally." AR560. Mr. Larson's ability to remember any new verbal learning later or after 30 minutes would be equivalent to an IQ score of 70. AR560.

Mr. Larson was a much better visual learner with scores from the 77th to 99th percentile.  AR561.  On the Halstead-Reitan Battery, Mr. Larson failed four of seven tests "for an Impairment Index score of .57 indicating near certain brain dysfunction."  Id.  Dr. Dickerson diagnosed: Dementia due to Organ Failure and Encephalopathy, as well as panic disorder with agoraphobia and dysthymia.  AR563.  Dr. Dickerson reference a 2013 New England Journal of Medicine report that "survivors of critical illness often have a prolonged and disabling form of cognitive impairment that remains inadequately characterized.  Longer duration of delirium was associated with worse global cognition and executive function scores."  AR564.  Dr. Dickerson also noted behaviors that "seem ingrained and dysfunctional but largely unconscious" reported by Mr. Larson's parents:  He was "hyper – but doesn't follow through and doesn't seem able to get necessary things done, for example, a re-application for food stamps."  AR554.  "In the most basic social and occupational responsibilities, like showing up on time for a job, appointments, he has a great deal of difficulty planning his time ….  He has great difficulty organizing and planning a day …. He doesn't seem able to set goals and plan the steps to achieve them.  He has trouble transitioning, shifting gears, and may be come angry when 'interrupted.' "  AR554-55.  The parents reported, "His sleep pattern is very fitful and disturbed.  He shops at night at Wal-Mart and HyVee around 2:00 a.m. to 5:00 a.m. to avoid crowds."  He wanted to please, and seemed to be good with children and animals, but otherwise did not seem to have any special strengths.  Id.  He had always had trouble making

friends.  Id.  He did not date or socialize with females.  Id.  He was the product of incest between an 18-year-old brother and 14-year-old-sister.  He discovered this when he was 23.  AR556.  Mr. Larson himself stated that "he felt that he did not fit in at home and felt that way to some extent while in school."  AR556.

Dr. Dickerson noted that Mr. Larson's "grip strength [testing] scores overall were normal for his age."  AR561-62.

Dr. Dickerson assessed Mr. Larson's GAF at 46 and opined that Mr. Larson could not perform the 209.687-026 Mail Clerk Job.  AR570.  He explained that on the GATB/SAGE Test a successful mail clerk is to have general learning ability and verbal ability equal to the middle third of the working population, and the reading and sorting of each new piece of mail is a new unique verbal learning task.  The task that best measures that ability neuropsychologically is on the Weschler Memory Scale 4 called verbal paired associates 1 and 2, and Mr. Larson had a scaled score of 5, or bottom 10% on part 1, and a score of 4 or bottom 2.5% on part 2.  AR570.  Dr. Dickerson also noted problems meeting the motor coordination, finger dexterity and manual dexterity for the job.  AR570.  Dr. Dickerson's background included a Masters and PhD in Rehabilitation Counseling Psychology.  AR565.  His work experiences included administering more than 700 VA Disability Evaluations and 200 Social Security Disability Evaluations.  AR565.  Dr. Dickerson also worked as a job placement interviewer and employment counselor where he tested job applicants to assess vocational and educational skills, and provided

career counseling and job placement and requires use of the *Dictionary of Occupational Titles* and related vocational materials.  AR566.

Mr. Larson saw PA Jacobsen for a diabetes check on November 1, 2013.  AR1448. The record noted that neuropsych testing had revealed some organic brain syndrome and Mr. Larson was applying for SSI.  AR1448.  Mr. Larson reported chronic back pain, anxiety, and sleep disturbances.  AR1448.  Examination revealed calf muscle cramps, thickening of the toenails, but the foot exam was otherwise normal.  AR1449.  He had no neurological deficits.  AR1449.  The assessment was Type 2 diabetes, uncomplicated and uncontrolled, and his A1C was high at 8.7.  AR1449, 1451.  Mr. Larson was provided insulin syringes for injections five times per day.  AR1449.

Mr. Larson saw PA Jacobsen on November 18, 2013, with complaints of low back and neck pain and numbness down to the left hand.  AR1446.  Mr. Larson reported feeling tired, and muscle spasms in the neck and back.  AR1446.  Examination revealed a BMI of 39.3, spasms in the left trapezius and rhomboid, with only the index finger tingling, improved from the prior week.  AR1447.  Hydrocodone was prescribed along with stretching exercises.  AR1447.

Mr. Larson saw PA Jacobsen on December 13, 2013, with ongoing chronic neck and back pain.  AR1444.  Mr. Larson had tried chiropractic treatment and massage with little relief and wanted to continue hydrocodone for pain.  AR1444.  Hydrocodone was continued and gabapentin added for his back pain.  AR1445.

### 7. Medical Evidence 2014

Mr. Larson saw PA Jacobsen on March 24, 2014, for a diabetes check and reported neuropathy pain, tingling and burning sensation, and dizziness side affects from gabapentin. AR1440. Mr. Larson's A1C was high at 9.3, and his diabetes was assessed as controlled, but later described under HgbA1c control as not improving. AR1442. His hydrocodone for pain was continued. AR1440.

Mr. Larson saw PA Jacobsen on June 27, 2014, for a diabetes check and reported home blood sugars running from 90-400, and continued chronic back pain. AR1437-38. His diabetes was assessed as uncontrolled, and his A1C was high at 9.6. AR1439, 1451.

Mr. Larson saw PA Jacobsen on September 18, 2014, for a diabetes check and reported that he had seen Dr. L. Hanson at the Vein clinic for a free consultation and was told he needed surgery but it would cost him $2000. AR1434. Mr. Larson also reported having blurry vision at times. AR1434. Mr. Larson's assessment was Type 1 diabetes – uncontrolled, and his A1C was high at 8.5. AR1435, 1451. Hydrocodone was continued for his back pain. AR1434.

Mr. Larson saw PA Jacobsen on December 24, 2014, for a diabetes check and his diabetes was assessed as Type 2 diabetes and uncontrolled, and his A1C was high at 8.9. AR1469, 1470.

### 8.    Medical Evidence 2015

Mr. Larson saw PA Jacobsen on March 16, 2015, for a diabetes check and it was assessed at Type 1 diabetes – uncontrolled, and his A1C was high at 8.8.  AR1467-1470.

Mr. Larson saw PA Jacobsen on April 13, 2015, and continued taking hydrocodone for his back pain, and his BMI was 40.7.  AR1464.  Mr. Larson's diabetes was assessed as Type 2 diabetes and uncontrolled.  AR1465.

Mr. Larson saw PA Jacobsen on June 25, 2015, for right hip and low back pain.  AR1481.  Mr. Larson reported that he has always had hip pain, but it was worse the last six weeks, and the pain in his right hip radiates around to the side and down the leg.  AR1481.  He was seeing a chiropractor weekly.  AR1481.  Examination revealed obvious muscle spasm on his upper hip area.  AR1482.

Mr. Larson saw PA Jacobsen on July 31, 2015, with complaints of shortness of breath, and reported his blood sugars had been 190-300, which he attributed to being under a lot of stress.  AR1479. Mr. Larson's diabetes was assessed as Type 1 diabetes – uncontrolled.  AR1480.

Mr. Larson saw PA Jacobsen on November 17, 2015, and his diabetes was assessed as Type 1 diabetes with hyperglycemia, long-term use of insulin.  AR1475, 1477.  His A1C was high at 9.1.  AR1475, 1477.  Mr. Larson also reported chest pain and shortness of breath for the last three months.  AR1476.

### 9.   Medical Evidence 2016

Mr. Larson's hydrocodone was continued in 2016 for his back pain. AR1473.

Mr. Larson saw Krista M. Hoyme, D.O., at Sanford Health for his diabetes on February 9, 2016, and his A1C was high at 9.9 and his diabetes was assessed as Type 2 diabetes uncontrolled; he was referred to the Diabetic Education department. AR1501, 1504.

On March 1, 2016, Mr. Larson's physical and mental status exam findings were unremarkable, including "alert, oriented to person, place and time, overweight, normal mood, behavior, speech, dress, motor activity, and thought processes." AR1504. His assessment included Diabetes Type 2, uncontrolled. AR1504.

Mr. Larson had a Doppler echo study on March 16, 2016, due to shortness of breath. AR1493. The study revealed normal left ventricular chamber size, mild left ventricular hypertrophy, normal LV systolic function, and LV ejection fraction of 60%. AR1493-95.

Mr. Larson saw Dr. Hoyme on March 25, 2016, for his diabetes and chronic pain issues. AR1509. Mr. Larson reported struggling to remember his long-lasting and short-acting insulin on a regular basis, but did report checking his blood sugars. AR1509. Mr. Larson reported ongoing back pain and some muscle spasms and continued to take hydrocodone and naproxen for pain and weekly chiropractic appointments. AR1509. Examination revealed limited range of motion in his back due to pain, antalgic gait, and otherwise

normal sensory and musculoskeletal exam. AR1509. His back was assessed as low back pain without sciatica and his diabetes continued uncontrolled. AR1509. His long-lasting diabetic insulin medication was changed, and his short-acting insulin was continued but less frequent. AR1509-10. Physical therapy was ordered for his back pain with a plan to wean him off of hydrocodone. AR1510. Mr. Larson had normal mental status findings, "alert, oriented to person, place, and time, normal mood, behavior, speech, dress, motor activity, and thought processes." AR1509.

Mr. Larson received 32 physical therapy treatment sessions between March 31, 2016, and October 18, 2016. AR1568. At his initial physical therapy evaluation, Mr. Larson was noted as "cooperative and motivated." AR1618. He was discharged with instructions to continue home exercises, join a fitness center, and to get good shoes. AR1568. At discharge, Mr. Larson continued to have sacroiliac pain on the right at least 1/10 at rest and 4/10 with activity. AR1568. His pain was exacerbated by sitting, standing, and walking, and helped by relaxation techniques and rest. AR1568. Mr. Larson's goal had been to decrease his pain through therapy to a tolerable level and it was "partially met." AR1568. Mr. Larson's ranges of motions were better following therapy, but still limited by pain. AR1569. Mr. Larson was doing very well walking after therapy with little to no trunk away and hip rotation, but still walking slowly. AR1569. Mr. Larson's goal to be able to perform activities with no sharp increases in pain that cause him to sit after 1-2 hours of activities was only partially met. AR1569. Mr. Larson's functional limitation

at the completion of the therapy sessions was described as "at least 20 percent but less than 40% impaired, limited, or restricted." AR1570. The intervention comments noted that Mr. Larson denied much change in his symptoms; same back and hip complaints. AR1570.

Mr. Larson saw Dr. Hoyme again on April 26, 2016, and his A1C was 8.9 and his diabetes continued controlled and a referral to an endocrinologist was planned. AR1513,1548. Mr. Larson also complained of pain in the finger on his left hand and edema in his legs with standing. AR1513. Mr. Larson had normal mental status exam findings, "alert, oriented to person, place, and time, normal mood, behavior, speech, dress, motor activity, and thought processes." AR1513.

On May 10, 2016, Mr. Larson saw Dr. Jonsson for follow up on uncontrolled hypertension. AR1515. Mr. Larson's hypertension had been very good lately, but his diabetes was out of control. AR1518. He had normal musculoskeletal and neurological exams, including normal range of motion. AR1518.

Mr. Larson saw Marcio L. Griebeler, M.D., an endocrinologist, on May 24, 2016. AR1530. Dr. Griebeler described Mr. Larson's diabetes as a "combination of type 2 diabetes mellitus due to significant insulin resistance as well as pancreatic induced hyperglycemia as he had multiple episodes in the past." AR1519. Mr. Larson reported blood sugars greater than 200 most of the time, his diet was not ideal, and he was using an insulin-to-carb ratio but was unsure how accurate his calculation was. AR1519. His A1C was 9.2.

AR1519.  Mr. Larson's insulin was increased and he was given information on carb counting and needed lifestyle changes to help better control his diabetes. AR1523.  Dr. Griebeler noted, "[t]he answer for better control of [Mr. Larson's] diabetes is lifestyle changes."  AR1523.

Mr. Larson saw Dr. Griebeler on June 21, 2016, and his blood sugars were improved, but still around the 200-300s and not at goal.  AR1525. Mr. Larson's diabetes complications included positive semiquantitative microalbuminuria.[4]  Mr. Larson's diabetes remained uncontrolled.  AR1529.

Mr. Larson had a sleep study on September 20, 2016, due to snoring, insomnia, possible sleep apnea with an Epworth score of 12. AR1498.  The results showed severe obstructive sleep apnea with an AHI of 90.3 and desaturations to the 83% range, and a CPAP was refused by Mr. Larson at that time.  AR1498.  No significant cardiac arrhythmias were shown.  AR1498.

Mr. Larson saw Dr. Hoyme on September 22, 2016, for right sided low back pain which radiates into the right leg along with weakness.  AR1536.  He reported his back pain was the same as always, but the leg pain and weakness were more intense than before.  AR1536.  Mr. Larson was receiving physical therapy and chiropractic treatments.  AR1536.  Examination revealed limited range of motion and extension in the back due to pain, and "[n]o significant palpable abnormalities," and intact muscle strength and testing in his lower

---

[4] Persistent microalbuminuria indicates a high probability of damage to the glomerular filtration capacity of the kidney and is of great diagnostic relevance in diabetes, for early diagnosis of diabetic nephropathy.  See https://www.ncbi.nlm.nih.gov/m/pubmed/82428899/

extremities. AR1536. The assessment was acute bilateral low back pain with sciatica. AR1536. Hydrocodone and continued PT were prescribed. AR1537.

### 10. Records Submitted to the Appeals Council

Mr. Larson returned to Sanford Medical Center on November 10, 2016, due to his sleep apnea following his initial sleep study for a CPAP titration study. AR749. A fair titration of CPAP to pressure of 11 CM was determined to control Mr. Larson's severe sleep apnea. AR750.

Mr. Larson saw Dr. Griebeler on January 9, 2017, for diabetes follow up. AR590. Mr. Larson's BMI was up to 42.9, and his last A1C from September was high at 8.7%, and his current blood sugars averaged 300. AR586, 590. Mr. Larson's diabetes continued to be uncontrolled with the current A1C abnormal at 8.6%. AR591. Dr. Griebeler noted that Mr. Larson had recently started on CPAP. AR591.

Mr. Larson saw Dr. Hoyme on January 24, 2017, with worsening neck pain, and more pain in his hips since ending PT. AR593. Examination revealed a very distended abdomen and lower chest which Mr. Larson attributed to bloating from his metformin, and he declined further recommended workup due to financial reasons. AR594. Additional physical therapy was recommended for his neck and hip pain. AR594.

### 11. State Agency Assessments

Non-examining DDS consultant Kevin Whittle, M.D., opined residual functional capacity ("RFC") on July 23, 2011. AR96-98. The claimant could lift and/or carry 20 pounds occasionally (1/3 or less of an 8-hour day) and 10

pounds frequently (1/3 to 2/3 of an 8-hour day), stand and/or walk about 6 hours, and sit a total of about 6 hours in an 8-hour work day; climb ramps, stairs, ladders, ropes, and scaffolds frequently; stoop, kneel, and crouch frequently. AR96-98. Exertional and postural limitations were "due to back pain." AR97. "Claimant appears to overstate limitations." AR96. "There is no indication that there is opinion evidence from any source." AR98. The DDS experts in 2011 did not consider mental impairments at the initial level. AR82-89.

Non-examining DDS consultant Gregory Erickson, M.D., affirmed Dr. Whittle's RFC opinion on March 6, 2012. AR108-10. Exertional and postural limitations were "due to back pain." AR109. At the reconsideration level the DDS psychological consultant found none-severe affective disorder and personality disorder, so no mental RFC assessment was completed. AR107.

Non-examining DDS consultant Dr. Whittle again reviewed Mr. Larson's file on April 1, 2015, and found that Mr. Larson had non-severe impairments of diabetes, other diseases of the blood and blood-forming organs, sleep related breathing disorders, and a severe impairment of his spine. AR897. Dr. Whittle stated that he gave "great weight" to the opinion of Brian K. Kidman, M.D., the consultative examining physician. AR899. Dr. Whittle found Mr. Larson could lift and/or carry 20 pounds occasionally (1/3 or less of an 8-hour day) and 10 pounds frequently (1/3 to 2/3 of an 8-hour day), stand and/or walk about 6 hours, and sit a total of about 6 hours in an 8-hour work day; climb ramps,

stairs, ladders, ropes, and scaffolds, stoop, kneel, crawl, and crouch occasionally. AR900. Exertional and postural limitations were "due to chronic back and neck pain related to DDD/DJD. AR900. Dr. Whittle referenced some of Dr. Kidman's findings from his consultative exam regarding Mr. Larson's spine impairment, but did not mention that Dr. Kidman stated Mr. Larson would be unlikely to tolerate work that required him to be on his feet, or required any significant amount of bending, stooping, crouching, or "not be able to do much in the way of lifting because of back pain...." AR1459, 901.

Non-examining DDS consultant James Barker, M.D., reviewed Mr. Larson's file on May 22, 2015. AR914-16. Dr. Barker also stated he gave Dr. Kidman's opinions from his CE exam "great weight." AR914. Dr. Barker found Mr. Larson's spine impairment to be severe, he also found obesity to be severe, and he found an RFC identical to the RFC determined by Dr. Whittle. AR914-15. Dr. Barker also referenced some of Dr. Kidman's findings from his CE exam regarding Mr. Larson's spine impairment, but did not mention that Dr. Kidman stated Mr. Larson would be unlikely to tolerate work that required him to be on his feet, or required any significant amount of bending, stooping, crouching, or that Dr. Kidman stated that Mr. Larson would also "not be able to do much in the way of lifting because of back pain...." AR1459, AR915.

Non-examining DDS consultant Stephanie Fuller, Ph.D., opined on March 8, 2012, that the claimant had non-severe affective and personality disorders resulting in "mild" restriction of activities of daily living; "mild" difficulties maintaining social functioning; "mild" difficulties maintaining

concentration, persistence or pace; and no episodes of decompensation. AR106-07.

Non-examining DDS consultant Jerry Buchkoski, Ph.D., opined on March 16, 2015, that Mr. Larson had severe anxiety disorder and severe affective disorder, resulting in "mild" restriction of activities of daily living; "moderate" difficulties maintaining social functioning; "moderate" difficulties maintaining concentration, persistence or pace; and no episodes of decompensation. AR897-98. Dr. Buchkoski found Mr. Larson was not significantly limited in eleven areas, and he was moderately limited in five areas including his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; and interacting appropriately with the general public. AR901-03.

Dr. Buchkoski opined that Mr. Larson had some cognitive issues, with average overall intellectual functioning, able to function better if he learns things hands on rather than being told what to do, and able to function in settings that are routine and involve limited contact with the general public. AR903.

Dr. Buchkoski stated that Mr. Larson was not significantly limited in his ability to get along with co-workers or peers. AR902. Dr. Buchkoski also stated that "He would likely function best in settings that involve limited contact with others." AR903.

Non-examining DDS consultant Doug Soule, Ph.D., opined on May 26, 2015, that Mr. Larson had severe anxiety disorder and severe affective

disorder, and also found he had a severe organic mental disorder.  AR912.  He found these severe impairments resulted in "mild" restriction of activities of daily living; "moderate" difficulties maintaining social functioning; "moderate" difficulties maintaining concentration, persistence or pace; and no episodes of decompensation.  AR912-13.  Based on those impairments he found Mr. Larson had the identical findings and mental RFC as determined by Dr. Buchkoski and outlined above.  AR916-18.  Dr. Soule also stated that Mr. Larson was not significantly limited in his ability to get along with co-workers or peers, and also stated that "He would likely function best in settings that involve limited contact with others."  AR917.

### 12.    Consultative Mental Examination – Shelley Sandbulte, Ed.D.

In March 2012, the state agency's psychological consultant, Shelley Sandbulte, Ed.D., issued her report following an examination of Mr. Larson with Mental Status Examination only, in December 2011.  AR397.  Mr. Larson denied a history of psychological problems.  AR397.  He had been teased or bullied all his life but did not know why.  AR398.  He was adopted as an infant and had no information about prenatal, birth, and/or postnatal difficulties.  AR399.  He had dropped out of two courses of study at technical institutes.  Id. He worked four times at Little Caesar's and for several other pizza and sandwich fast food restaurants.  He described a variable sleep pattern while working.  AR400.  At his last job with Pizza Hut, "They told me that I was too slow and took too much time on deliveries, but I knew what it really was."  Id. Dr. Sandbulte stated "I had a strong sense throughout the work history

questions that Neil had problems with either the management or his performance – thus precipitating the various job changes. Neil didn't like the way he was treated and/or talking to by management and would either quit or be 'let go.' " He thought the fundamental cause of work and health problems was unstable blood sugars: "If your blood sugar is too high you get tired and lethargic and take too long thinking and it affects your vision and your mood." Id. He said he was a loner, saw two friends occasionally, but "often has to back out of plans at the last minute due to his health/pain so finds it easier to just not make plans to socialize." Id.

Dr. Sandbulte found Mr. Larson had good and consistent eye contact throughout the interview with appropriately expressive speech. AR400. Mr. Larson appeared to be of average intellectual ability with logical, organized and coherent thoughts. AR401. Mr. Larson had intact immediate memory, recent memory, and recent past memory, and his remote memory was 'for the most part intact," but he had difficulty remembering the names of his physicians and one of the past three presidents." AR401. Dr. Sandbulte recorded activities of daily living. AR401-02. Mr. Larson reported spending most of the day lying on the floor, describing back, hip and leg pain, and numbness. AR401. He reported that varicose veins caused his feet to swell so he was unable to stand long periods. Id. Dr. Sandbulte noted Mr. Larson "[f]inds it difficult to sit or stand although [she] did not notice Neil shifting in his chair or standing to move around during the interview." AR401. He described difficulty sleeping. He used a microwave and toaster, did laundry

and some light cleaning.  Id.  He took short walks, drove his car and shopped

for short periods.  AR401-02.  His parents provided financial help to him and

his younger sister, who lived with him.  Id.  He felt bad about this due to his

parents' age and finances.  Id.

Dr. Sandbulte stated that DDS provided the following documents for her

review:  Office record from Stanley Practice Physician, Dr. Wallace Fritz, for

Mr. Larson's diabetic check on June 29, 2011; Vocational Rehabilitation letter

from Vicki C. Nelson dated July 7, 2011; Sanford Emergency Department notes

per Dr. Chris Carlisle from Mr. Larson's visit on October 9, 2011, and Section

D remarks from the SSA Adult Function Report.  AR402-03.  Dr. Sandbulte

stated she was also able to review Dr. Nardini's November 11, 2008, report that

he prepared after interviewing Mr. Larson.  AR402.  Dr. Sandbulte opined

diagnoses:  Axis I:  Consider Dysthymia.  Axis II:  Dependent Personality

Disorder; Narcissistic Personality Features – selfcenteredness and entitlement.

Id.  "Neil's sad mood could plausibly be a direct result of his declining

health...."  AR403.  "It's unclear how much of Neil's declining health ... has

been noncompliance with his physicians orders" (referring to self-

discontinuation of insulin and glucose-monitoring in 2002), and "uses Family

Practice physician to monitor his diabetes although was strongly recommended

to follow with diabetic specialist/endocrinologist," and how much was due to

"lack of motivation for being proactive in his own healthcare and

independence."  Id.  She stated, "I'm not sure if his mood is a direct result of

his declining health or if his depressed mood has negatively impacted his own

ability to take control of his health." Id.  Dr. Sandbulte opined that Mr. Larson

"has the intellectual ability and sufficient thought process/memory to follow

directions and learn and retain new information in an employment situation."

AR403.  Dr. Sandbulte further opined that Mr. Larson had no psychiatric or

psychological issues that would interfere in his "ability to be employed and/or

negatively impact his activities of daily living.  Therefore, his alleged disability

would indeed revolve around the diabetic process itself and consequences of

his chronic obesity."  AR404.

### 13.    Consultative Physical Examination – Brian K. Kidman, M.D.

Mr. Larson was seen on March 5, 2015, for a consultative exam by

Dr. Kidman.  AR1456.  Dr. Kidman noted that Mr. Larson reported 15 different

conditions affecting his disability claim, and Dr. Kidman stated, "the allotted

time for the visit today is not long enough to evaluate all 15 conditions in

depth..." AR1456.  Mr. Larson's alleged conditions included chronic back pain,

neck pain, sleep disorder, renal disorder, diabetes, brain damage/multi-organ

failure, obesity, wrist pain, and left hand pain and numbness.  AR1456-57.

Mr. Larson's medications included Tricor, Crestor, naproxen, hydrocodone, and

insulin.  AR1457.  Examination revealed Mr. Larson was 5'9½" tall and

weighed 267 pounds, blood pressure 156/88, mood was depressed, range of

motion of the cervical spine was reduced and rotation caused pain on the right,

range of motion of the thoracic and lumbar spine was also reduced, reduced

wrist range of motion, and was only able to squat about one-fourth the way

down and needed to use his arms to rise.  AR1459.  X-rays showed

degenerative disc disease with severe spurring and near fusion at C5 through C7, and probable facet arthropathy of the cervical spine and what appeared to be neuroforaminal narrowing on the left side at C6/C7.  AR1459.  Lumbar x-rays revealed degenerative disc disease with mild anterior spurring and some facet arthropathy at L4 through S1, and some degree of spondylolisthesis at L5/S1.  AR1459.  X-rays of the right wrist were normal.  AR1459.

Mr. Larson reported his daily activities to Dr. Kidman.  AR1458.  Mr. Larson watches television, searches/surfs the internet, and sometimes goes grocery shopping in the evenings.  Id.  He lives alone, prepares simple meals, and performs chores around the house.  Id.  He handles his own finances.  Id.

Dr. Kidman's assessment was chronic back pain mostly low back supported by x-ray findings, and Mr. Larson would be unlikely to tolerate work that requires him to be on his feet, or requires any significant amount of bending, stooping, crouching, etc.  AR1459.  Dr. Kidman stated that Mr. Larson would also "not be able to do much in the way of lifting because of back pain..."  AR1459.  Dr. Kidman stated that Mr. Larson's cervical x-rays certainly showed a pain-causing source and he was "surprised that his complaint of neck pain is not more significant" given the x-ray findings and the reduced range of motion on exam.  AR1459.  Dr. Kidman stated Mr. Larson appeared to have a "multi-source sleep issue" and if he was unable to get additional help sleep deprivation could cause anyone to have issues with focus and energy necessary for work performance.  AR1460.  Under Diabetes,

Dr. Kidman stated, "It would seem that this could be better controlled with lifestyle changes and appropriate medication but if that is not able to happen, then by his description it sounds like he has difficulty with particularly elevated blood sugars causing difficulty with concentration." AR1460. Dr. Kidman stated that a neuropsych examination would be helpful regarding Mr. Larson's brain damage and multi-organ failure. AR1460.

## C.      Testimony at ALJ Hearings

### 1.      Mr. Larson's Testimony at March, 2013 Hearing

Mr. Larson testified that he "completed high school, but I didn't graduate...I have a GED." AR39. He went to vocational-technical school for a year but did not complete the course he started. AR39.

Mr. Larson testified he worked mostly in food service. AR39. He was fired for taking too long to deliver pizzas; it took longer because of driving through five o'clock traffic and road construction. AR41. He stated that he was "leaving work early sometimes... because I wasn't feeling good," and he was "[t]ired and fatigued." AR41. "There were a few times I had extremely low blood sugar and then I was dizzy and shaky and weak." His blood sugars were "still up and down" although he took medicine according to the doctor's recommendations. AR42.

Mr. Larson testified that he had poor circulation in his legs, varicose veins in his right leg, and his legs swelled if he stood too long. AR42. He would get sharp pain from varicose veins from standing too long or even sitting. AR44. "I first had diabetes in 2002 when I got out of the hospital from having

pancreatitis." A month later his blood sugar normalized "so I took myself off of the insulin." AR43. He was on insulin now, but sometimes his blood sugar was high and caused dizziness for two hours to half a day. When he got dizzy he lay on the floor. AR46.

Mr. Larson described his sleep pattern. He was able to sleep about two hours at a time. He slept three to four hours during a 24-hour period, "Day or night. It's just randomly." He did not know why. "I just wake up and then I can't get back to sleep again." AR48.

Mr. Larson testified that if he sat longer than two hours at a time his legs would swell up and cause pain in his feet and legs. AR49-50. He was able to stand about a half an hour at a time, three hours in a day. The leg affected by varicose veins was painful if he stood longer than a half-hour. His feet swelled up to the ankle and turned purple at times. AR51.

Mr. Larson testified he experienced back pain, but did not have money to pay for the CT scan his Community Health provider recommended. AR44. His doctor thought if he lost weight he would possibly have less back pain. AR53. His back pain caused trouble walking sometimes, and sitting and standing. AR44-45. "I have weakness in my legs." He experienced shooting pain down both legs about every two weeks. He had good days and bad days. AR45. He thought he could lift 60 pounds if his back wasn't bothering him. AR51. He testified that his back pain level is on average a 2-3 out of 10. AR45.

Mr. Larson testified that he had "a little bit of anxiety at times and some people have said that I have maybe a lot of anxiety." AR54. He lived in

subsidized housing and received food stamps; he had no children, lived alone, and his parents paid for his rent, car insurance, gas, and medications.  AR51-52.

### 2.  Mr. Larson's Testimony at November, 2016 Hearing

Mr. Larson testified he was 5'10" tall and weighed 270 pounds.  AR788. Mr. Larson testified that the only work he had done since 2007 was taking people to appointments one to two hours per month.  AR790.  He manages his own money, and he has no problems reading, writing, or with simple math. AR789.  He said he was terminated from his pizza delivery job because they said he was taking too long on his deliveries.  AR790.  Mr. Larson said his parent support him, and he receives food stamps and reduced rent, which he received due to a doctor's note stating he qualified for HUD housing.  AR790-91; 812.

Mr. Larson testified that he had chronic back pain, which radiates to his legs at times, hip pain, uncontrolled diabetes, trouble with his hands, and swelling in his legs if he sits too long.  AR792-799.  He stated he was taking naproxen, acetaminophen, and hydrocodone for his pain.  AR794.  Mr. Larson testified that he had not had injections for his back or his hips.  AR795, 800. Mr. Larson testified that he had trouble with repetitive squeezing motion with his right hand and difficulty with buttons, and zippers due to numbness and tingling.  AR800.  He testified that his treating physicians have assigned him no limitations with respect to lifting, standing, walking or sitting.  AR796.

Mr. Larson testified he had been an insulin dependent diabetic since 2005, and he checked his blood sugars two to eight times per day, which run 100-300, with times as high at 400-500. AR796-97. He said when it is at 300 he gets dizzy, thirsty, and has frequent urination. AR797. Mr. Larson testified that when his blood sugar is low he gets confused and when it's high he had trouble concentrating, he gets irritable, and his pain and inflammation is worse. AR806, 814-15.

Mr. Larson testified that he had anxiety problems and had problems with crowded or noisy places. AR802. He was undergoing no psychological or psychiatric treatment, but had attended counseling in the past. AR804-05. He lives alone, and he has a few friends in his apartment building that he visits or watches television outside or at the apartment building's community room. AR787, 805.

Mr. Larson watches television, reads "a lot on the internet" daily, and plays computer games, mainly solitaire. AR806. He has no difficulty following the storyline or plot when he watches television. Id. When asked if he had difficulty getting dressed he said he had problems putting socks on. AR807. The ALJ then moved on without asking Mr. Larson if he had any other problems getting dressed. AR807. He cooks meals for himself and performs household chores such as washing clothes and taking out the garbage, but he has trouble standing for long periods. AR808. He drives and goes grocery shopping, but prefers to go at night to "stay away from crowds." AR808-09. He can perform vehicle maintenance, noting he recently replaced a water pump—

38

though it took him two days rather than one and a half hours for such task in the past.  AR809-10.

Mr. Larson testified he was on the Medical Assistance for Workers with Disabilities, (MAWD) program and that is how he obtained Medicaid.  AR812.

Mr. Larson testified that he is on the internet for hours per day but when doing so he was laying down.  AR814.

### 3.     Vocational Expert ("VE") Testimony

The ALJ asked the VE a hypothetical with limitations consistent with the RFC he determined, and the VE testified the person would be unable to perform Mr. Larson's past work, but could perform the occupations of garment sorter, DOT# 222.687-014, laundry worker, DOT# 361.687-014, and hotel housekeeper, DOT# 323.687-014.  AR816-18.  The VE provided no regional numbers of jobs available for those occupations, only national numbers. AR818.

The VE testified that his testimony regarding the occupations and the restrictions on overhead reaching was based on his observations of those jobs. AR818.  The VE had 40 years of experience as an employment rehabilitation educator and counselor.  AR818.

The VE testified that an individual would be unemployable if they were absent more than one day per month from an unskilled job, or if they needed to take breaks in addition to typically afforded breaks, or if they were unable to maintain attention and concentration for two-hour segments.  AR818.

The VE testified that if Mr. Larson was limited to occasional handling, fingering and feeling he would not be able to identify any light, unskilled jobs he could perform.  AR819.

The ALJ never asked the VE whether his testimony was consistent with the Dictionary of Occupational Titles.  AR815-21.

**D.      Other Evidence**

Dr. Newbold, SSA interviewer, described Mr. Larson:  "clean casual dressed, appeared to be overweight.  Very slow in answering – long pause before responded."  AR265-66.

Mr. Larson responded to questions on a "Function Report."  AR285.  He used to be able to "be employed, fix cars, cook meals from scratch.  Rode a bike."  Id.  His sleep was affected:  "I wake up gasping for air and have significant pain in my back that radiates down both of my legs."  Id.  "I have times where I only sleep a couple hours at a time at night."  AR288.  He was tired during the day and did not sleep well at night.  AR287.  He did not need reminders to take care of personal needs and grooming, or to take medicine. He prepared his own meals, frozen dinners and sandwiches.  Id.  He had problems washing dishes and did this for only a few minutes.  He needed help with cleaning and dishes.  Id.  He went outside "for medical appointments & grocery shopping."  AR288.  He drove a car and he was able to go out alone. He shopped for groceries once a week.  He paid bills with help from retired parents.  He did not have a check book or bank account.  Id.  He watched television.  For social activities, "Will meet with a few people in the community

room at my apartment."  He did not state how often or how long he engaged in this social activity.  AR289.  He circled affected activities:  lifting, squatting, bending, etc., but not concentration, completing tasks, understanding, following instructions, or getting along with others.  He said he could pay attention "OK," finished what he started, followed written instructions "Ok" and spoken instructions "fair."  AR290.  He said he had never been fired because of problems getting along with others.  He said he handled stress "fairly well" and changes in routine "OK."  AR291.

On October 13, 2011, in a "Disability Report – Appeal" Margaret Moxnes, Independent Living Choices caseworker, was identified as someone who could help with the claim, and provided contact information.  AR295.  Mr. Larson reported he was unable to put on socks because of back pain and shortness of breath, or stand and move long enough to cook, clean and do dishes.  AR299.

Vicki C. Nelson provided unsigned typewritten "remarks," stating that Mr. Larson reported his health had declined and he was not employed due to health issues and inability to receive appropriate health care.  The remarks included Mr. Larson's reported "inability to sleep more than 2-3 hours at a time during the night … Because of the extreme highs and lows of his blood sugars, having his sleep interrupted … he needs to take frequent naps during the day.  AR300, 302.

Mr. Larson reported seeking treatment at Avera Endocrinology in 2009:  "because I didn't have insurance he said he would only see me a couple of

times.  The last time I seen him I was with him for 7 minutes and he charged me $169.00."  AR272.

In a Disability Report dated April 23, 2015, Mr. Larson stated that usually, but not always, he was aware of his symptoms with high or low blood sugar, and with high blood sugar he felt hungry, thirsty, blurred vision, grogginess, dizziness, inability to concentrate, tired and forgetful and after an episode it took two to eight hours to recover to normal.  AR1217.  He reported that with low blood sugar he felt weak, shaky, confused and helpless, and he takes some glucose tablets and feels OK in an hour.  AR1217.

## DISCUSSION

### A.    Standard of Review.

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action."  Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (internal punctuation altered, citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. <u>Minor</u>, 574 F.3d at 627. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005); <u>Woolf v. Shalala</u> 3 F.3d 1210, 1213 (8th Cir. 1993). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. <u>Oberst v. Shalala</u>, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." <u>Mittlestedt v. Apfel</u>, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. <u>Smith v. Sullivan</u>, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. <u>Walker v. Apfel</u>, 141 F.3d 852, 853 (8th Cir. 1998) (citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. <u>Smith</u>, 982 F.2d at 311. Where "[s]everal errors and uncertainties in the opinion [occur], that individually might not warrant remand, in combination create sufficient doubt about the ALJ's rationale for denying" benefits, remand for further

proceedings before the agency is warranted.  <u>Willcockson v. Astrue</u>, 540 F.3d 878, 880 (8th Cir. 2008).

**B.     The Disability Determination and the Five-Step Procedure.**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.[5]  The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled.  This sequential analysis is mandatory for all SSI and SSD/DIB applications.  <u>Smith v. Shalala</u>, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520.  The five steps are as follows:

> Step One:    Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

> Step Two: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work

---

[5] Although Mr. Larson has applied for both Title II and Title XVI benefits, for the sake of simplicity, the court herein cites to only the regulations applicable to Title II where the Title XVI regulation is identical.  It is understood that the provisions of both Titles are applicable to Mr. Larson's application.  Any divergence between the regulations for either Title will be noted.

activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 404.1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

Step Three: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. Bartlett v. Heckler, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 404.1520a(c)(2).

Step Four: Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

Step Five: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 404.1520(f).

## C.  **Burden of Proof.**

The plaintiff bears the burden of proof at steps one through four of the

five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994);

Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at step five. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994). "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting at step five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

**D.  The Parties Positions**

Mr. Larson asserts the Commissioner erred in two ways:  (1) The RFC formulation is not supported by substantial evidence; and (2) the Commissioner's Step 5 determination that there are occupations Mr. Larson is capable of performing is not supported by substantial evidence.  The RFC assignment of error has three sub-parts: (1) the Commissioner failed to properly determine the limitations associated with Mr. Larson's impairments; (2) The Commissioner failed to properly evaluate the medical opinions; and (3) the Commissioner failed to properly consider Mr. Larson's alleged noncompliance with medical advice.

The Commissioner asserts her decision is supported by substantial evidence in all respects and should be affirmed.

**E.    Analysis**

Mr. Larson's assignments of error are discussed below in turn.

**1.    The RFC Formulation**

The ALJ determined Mr. Larson is capable of less than a full range of light duty work.  AR727.  Specifically, the ALJ found Mr. Larson capable of lifting/carrying 20 pounds occasionally and 10 pounds frequently.  The ALJ found Mr. Larson capable of sitting for 6 hours out of an 8-hour workday, and standing/walking for 6 hours out of an 8-hour workday.  The ALJ found Mr. Larson capable of occasionally reaching overhead bilaterally with his upper extremities, and frequently handling, fingering, and feeling with his upper extremities.  The ALJ found Mr. Larson capable of occasionally operating foot controls with his bilateral lower extremities, occasionally climbing ramps and ladders, balancing, stooping, kneeling and crouching.  The ALJ found Mr. Larson could never climb ladders or scaffolds, crawl, or work at unprotected heights or work with dangerous moving mechanical parts.

From a mental standpoint, the ALJ found Mr. Larson retained the ability to understand, remember, and carry out short, simple instructions.  The ALJ also found Mr. Larson able to respond appropriately to changes in a routine work setting and to only make judgments on simple work-related decisions.  The ALJ found Mr. Larson is able to interact appropriately with supervisors only on an occasional basis and with the public and co-workers only on a brief

and superficial basis.  Finally, the ALJ found Mr. Larson can engage in goal-oriented work which is defined as being given a task or series of tasks to perform so long as it does not matter when the task or series of tasks is performed, and as long as it is performed by the end of the workday or work shift.  AR727.

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered).  "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability.  20 C.F.R. § 404.1545(b)." Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013).  The formulation of the RFC has been described as "probably the most important issue" in a Social Security case. McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are not severe. Lauer, 245 F.3d at 703; Social Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996).  Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on *all* the relevant evidence . . . a claimant's residual

functional capacity is a medical question."[6] Lauer, 245 F.3d at 703 (citations omitted) (emphasis added). Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." Id. (citations omitted).

"The RFC assessment must always consider and address medical source opinions." SSR 96-8p. If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." Id. "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight. If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight." Id.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ. Id. at n. 8. Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations. Id.

---

[6] Relevant evidence includes: medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations. See SSR 96-8p.

However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source.  Id.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity."  SSR 96-8p.  However, the ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC."  Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . .  In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  Id.

"[T]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  Reed, 399 F.3d at 923 (citations omitted, punctuation altered); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

While it is true that the ALJ is free to formulate the RFC from all the evidence including the opinion evidence and the medical records, it is also established law that the ALJ may not substitute its own opinions for those of the physician. Finch v. Astrue, 547 F.3d 933, 938 (8th Cir. 2008), nor may the ALJ "play doctor" or rely on its own interpretation of the meaning of the medical records. Pate-Fires v. Astrue, 564 F.3d 935, 946-47 (8th Cir. 2009).

These principles were recently reaffirmed in Combs v. Berryhill, 878 F.3d 642, 647 (8th Cir. 2017). In Combs, the claimant alleged disability as a result of combined impairments of rheumatoid arthritis, osteoarthritis, asthma, and obesity. Id. at 643. The only medical opinions in the file regarding Ms. Combs' RFC were from two State agency physicians who had never treated or examined Ms. Combs. Id. at 644. Those physicians instead based their opinions on their review of Ms. Combs' medical records. They gave differing opinions as to Ms. Combs' RFC (one opined she was capable of light duty work, while the other opined she was capable of only sedentary work). Id. at 645.

In deciding which opinion to credit, the ALJ found Ms. Combs' subjective complaints not entirely credible based upon the ALJ's own review of her medical records and notations therein which indicated she was in "no acute distress" and that she had "normal movement of all extremities." Id. The State agency physicians apparently did not base their opinions on these observations. Ms. Combs asserted the ALJ should have contacted the physicians for clarification of what the notations meant rather than rely upon its own inferences. Id. at 646.

The Eighth Circuit agreed, concluding the ALJ erred by relying on its own inferences as to the relevance of the two phrases "no acute distress" and "normal movement of all extremities" as it was significant to her conditions. Id. at 647. The court found the relevance of these medical terms was not clear in terms of Ms. Combs' ability to function in the workplace, because her medical providers also consistently noted in their treatment records that she was had rheumatoid arthritis, prescribed medication for severe pain, and noted trigger point and joint pain with range of motion. Id. So, by relying on its own interpretation of "no acute distress" and "normal movement of all extremities," in terms of Ms. Combs' RFC, the ALJ failed to fulfill his duty to fully develop the record. Id.

Additionally, SSR 96-8p instructs ALJs how to determine RFC and how to explain their determinations. That ruling contains requirements for the ALJ's narrative discussion. One of those requirements is that the RFC assessment must "include a resolution of any inconsistencies in the evidence as a whole . . ." Id. at p. 13. Another is that "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Id. at p. 14. Mr. Larson asserts the ALJ's formulation of his RFC was not supported by substantial evidence for a variety of reasons, discussed below.

### a. The Limitations Associated With Mr. Larson's Impairments

Mr. Larson asserts the ALJ failed to properly assess the limitations associated with his neck impairment and his severe personality disorder. In both instances, Mr. Larson claims the ALJ based the RFC limitations not upon the medical evidence in the record, but upon the ALJ's own inferences.

Regarding Mr. Larson's neck impairment, the ALJ found Mr. Larson had a severe impairment of chronic neck pain due to degenerative disc disease. AR724. The ALJ found Mr. Larson's cervical spine impairment is "worse than his lumbar spine." AR731. The ALJ did not specifically indicate upon what medical evidence it based this finding.

The ALJ noted, however, that the X-ray which showed Mr. Larson's cervical degenerative disc disease with severe spurring and near fusion at C5 through C7 and neuroforaminal narrowing at C6-C7, and an X-ray of Mr. Larson's lumbar spine which showed degenerative disc disease from L4-S1 with spurring and some facet arthropathy. AR731. The ALJ also stated Mr. Larson did not complain as much during the hearing about his neck pain as he did about his back pain. Id. The ALJ concluded, "nevertheless, the severe degenerative disc disease in his neck serves as the basis for limitations to only occasional overhead reaching and a finding he should not crawl or climb ladders or scaffolds." Id.

Next, the ALJ noted Mr. Larson's neck issues caused him to have "grip issues," and cited the grip testing performed by Dr. Dickerson during his 2013 evaluation. Id. The testing showed 43-pound grip strength equal bilaterally.

Id. The ALJ noted, "however, at that time, he was wearing no braces and had not had any electromyogram or nerve conduction studies. Still, the undersigned accepts that claimant struggles with this at times and is limited to frequent handling, fingering, and feeling." Id.

Mr. Larson asserts the ALJ's formulation of the RFC is flawed because the ALJ made drew its own inferences about what physical restrictions were appropriate to accommodate Mr. Larson's severe cervical degenerative disc disease. Mr. Larson asserts the ALJ's conclusions in this regard were not based upon any medical opinion; instead the ALJ improperly substituted its own opinions for those of the medical experts.

The ALJ is free to formulate the RFC from all the evidence including the opinion evidence and the medical records, but the ALJ may not substitute its own opinions for those of the physician. Finch, 547 F.3d at 938. Nor may the ALJ "play doctor" or rely on its own interpretation of the meaning of the medical records. Pate-Fires, 564 F.3d at 946-47. These principles were recently reaffirmed as explained above in Combs, 878 F.3d at 647.

The ALJ acknowledged the X-ray of Mr. Larson's cervical spine showed severe degenerative disc disease, severe spurring, and a near fusion at the C5-C7 level, along with what appeared to be neuroforaminal narrowing on the left side at C6-7. AR731. The ALJ concluded the severe cervical disc disease served as the basis for limitations for only occasional[7] overhead reaching and a

_____

[7] The ALJ found Mr. Larson capable of only occasional overhead lifting, but *frequent* handling, fingering and feeling with the upper extremities. At the hearing, the VE stated he would not have been able to identify any light-duty,

finding he should not crawl or climb ladders.  Id.  The ALJ also commented

Mr. Larson's neck problems have resulted in some "grip issues" citing

Dr. Dickerson's grip-strength testing.  Id.  The ALJ's discussion about

Mr. Larson's neck issues causing  him to have "grip issues," the grip testing

performed by Dr. Dickerson during his 2013 evaluation, and Mr. Larson never

having worn any type of braces or having undergone an electromyogram or

nerve conduction test is the extent of the explanation the ALJ offered for the

connection between the medical evidence and the RFC limitations (or lack

thereof) it formulated for Mr. Larson's cervical spine/neck.

The ALJ did not refer to any medical or expert opinion evidence

connecting the RFC limitations it formulated regarding the severe cervical disc

disease.   There is no physician opinion which comments upon the need, or

lack thereof, for bracing on Mr. Larson's hands or arms or neck, or what

further or better information electromyogram or nerve conduction studies

would have provided.  In brief, the Commissioner cites the ALJ's statement that

it gave "some" weight to the State agency physician's physical restrictions

(AR733), noting that those doctors did not assign *any* manipulative limitations

(AR915).  That is correct, but it does nothing to help discern how the ALJ

interpreted the severe cervical X-ray findings, the lack of "braces" and the lack

of any electromyogram testing to translate into an upper extremity  limitation

---

unskilled jobs Mr. Larson would be capable of performing if Mr. Larson was
able to only occasionally handle, finger and feel with his upper extremities.
AR819.

of *frequent* handling, fingering and feeling.  There is no medical evidence to support such an interpretation.

Mr. Larson argues this failure to request further clarification from a medical professional is akin to the mistake the ALJ made in Combs—i.e. that the ALJ drew its own inferences from portions of the medical records to determine how Mr. Larson's medical conditions affected his ability to function in the workplace in order to formulate his RFC.   The ALJ did not choose between properly submitted medical opinions.  Instead, he did what he is not permitted to do.  He "set his own expertise against that of a physician who testified before him."  Combs, 878 F.3d 647; Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004); Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000); Gober v. Matthews, 574 F.2d 772, 777 (3d Cir. 1978)(the ALJ "may not simply draw his own inferences about plaintiff's functional ability from medical reports.").

The ALJ rejected the State agency physician's opinion that Mr. Larson had no manipulative limitations.  The ALJ therefore should have sought out a medical opinion regarding what effect Mr. Larson's severe cervical degenerative disc disease had upon his RFC –specifically his upper extremity limitations and his  range of motion in the cervical spine.  This is especially true because two of the three jobs the ALJ identified as Mr. Larson being able to perform (Garment Sorter, DOT # 222.687-014; Laundry Worker, DOT# 361.687-014; Hotel Housekeeper, DOT# 323.687-014) require frequent near acuity, and all of them require frequent reaching and handling.  Instead, the ALJ decided on its own

that Mr. Larson did not need any restrictions on the ability to move or twist his cervical spine, and that the restriction to *frequent* handling, fingering and feeling was sufficient. Because the ALJ drew its own inferences in this regard, the RFC is not supported by substantial evidence in the record as a whole, and case must be remanded for further proceedings.

The other area of the RFC in which Mr. Larson asserts the ALJ improperly drew inferences is Mr. Larson's severe personality disorder. Specifically, the ALJ found at Step 2 of the analysis that Mr. Larson had a severe personality disorder. AR724. The ALJ did not explain the basis for this finding at Step 2, nor did the ALJ mention Mr. Larson's severe personality disorder at Step 3 (the Listings), nor anywhere else in the ALJ's decision.

The opinions in the record that opined Mr. Larson had a personality disorder were one of the State agency psychological physicians (Dr. Fuller) at the reconsideration level in 2012 (AR107) and consultative examiner Dr. Shelly Sandbulte in 2011 (AR402). Both those experts diagnosed Mr. Larson with personality disorder, but found it was not severe. AR107, 402.

The other psychological experts in the record found Mr. Larson had severe mental impairments of anxiety, affective disorders, and organic mental disorder, a finding which the ALJ also made in its decision and with which Mr. Larson does not take issue.

In brief, the Commissioner understands Mr. Larson's criticism of the ALJ's decision to be that the ALJ should not have included personality disorder as a severe impairment in the first place because there is no medical opinion in

the file which identifies personality disorder as a severe mental impairment. See Commissioner's brief, Docket 16, p. 8. The ALJ, therefore, must have drawn its own inferences from the records to reach the conclusion that Mr. Larson's personality disorder was severe rather than non-severe. If that is the argument Mr. Larson intended to make, the court agrees. As Mr. Larson argues elsewhere the ALJ is not free to draw its own inferences from the medical records. An ALJ may choose between properly submitted medical opinions, but is not permitted to "set his own expertise against that of a physician who testified before him." Combs, 878 F.3d 647; Strongson, 361 F.3d at 1070; Nevland, 204 F.3d at 858); Gober, 574 F.2d at 777 (the ALJ "may not simply draw his own inferences about plaintiff's functional ability from medical reports.").

Mr. Larson's argument may mean to suggest the RFC formulation is deficient because no limitations are apparent that are connected to the personality disorder which the ALJ acknowledged (whether severe or non-severe, as limitations related to all medically determinable impairments must be accounted for in the RFC). That argument likewise does not score the runner. Mr. Larson does not suggest what additional mental limitations the ALJ should have added to the RFC that were not already included as a result of his three severe mental impairments (panic disorder with agoraphobia; dysthymia; dementia due to a history of organ failure and encephalopathy).

Further, the Listings for panic disorder (12.06); dysthymia (12.04) and dementia due to organ failure (12.02) all contain the same "B" criteria[8] as does the Listing for Personality disorders (12.08).  The court acknowledges the RFC analysis is different than the Step 3 analysis, and the SSA regulations describe the distinction between the "B" criteria and the limitations in the RFC determination.  Hosch v. Colvin, 2016  WL 1261229 at *5 (N.D. Iowa, Mar. 30, 2016); 20 C.F.R. § 404.1520a; SSR 96-8p (all explaining the difference between the "B" criteria at Step 3 and assigning functional limitations at Step 4 of the analysis).

Section 404.1520a(e)(4) explains that the RFC in the ALJ decision "must include a specific finding as to the degree of limitation in each of the areas described in paragraph (c) of this section."  Among those factors are the "B"

_____

[8] In some instances, the "B" criteria are part of the Step 3 of the analysis to determine whether a claimant's mental impairment is severe.  For all the mental impairments identified by the ALJ as severe for Mr. Larson, the "B" criteria were part of the determination, and were the same.  The "B" criteria for Listings 12.02, 12.04, 12.06, and 12.08 are a claimant's ability to: (1) understand, remember or apply information;  (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself.

Within each of the four "B" criteria, representative examples are provided in the regulation.  See e.g. § 12.00.E.1, explaining that for understanding, remembering or applying information, examples would be: a claimant's ability to understand and learn terms, instructions and procedures; following one or two-step oral instructions to carry out a task; describing a work task to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reasoning and judgment to make work-related decisions.

For each of the "B" criteria, the claimant's limitation is rated as extreme, marked, moderate, mild, or none.  See 20 C.F.R. Pt 404, Subpt. P. App. 1, § 12.00.F.2(a-e).

criteria.  See Section 404.1520a(c)(4).  And SSR 96-8p explains in part that as

to the "B" criteria,

> The adjudicator must remember that the limitations identified in
> the "paragraph B" and "paragraph C" criteria are not an RFC
> assessment but are used to rate the severity of mental
> impairments at Step 2 and 3 of the sequential evaluation process.
> The mental RFC assessment used at steps 4 and 5 of the
> sequential evaluation process *requires a more detailed assessment*
> *by itemizing various functions contained in the broad categories*
> *found in paragraphs  B and C of the adult mental disorders Listings*
> *found in 12.00 of the Listing of Impairments, and summarized on the*
> *PRTF.*

SSR 96-8p (emphasis added).

The RFC formulation then, is at least in part an itemized version of the

examples found in § 12.00 of the "B" criteria of the Listings.  In this case,

however, because the "B" criteria are all the same for personality disorder as

they are for the three severe mental impairments with which Mr. Larson does

not take issue, the court is at a loss to understand what more Mr. Larson seeks

for RFC limitations to accommodate his mental impairments.  The court will

not remand on this basis.

### b.      The ALJ's Evaluation Of The Medical Opinions

Next, Mr. Larson asserts the ALJ failed to properly evaluate the medical

opinions in the file.    There are no medical opinions in the file about

Mr. Larson's RFC from any of his treating physicians.  Instead, there are

opinions from the following:

- State agency, non-treating, non-examining medical consultants.  The
  State agency medical consultant from 2011 and 2015 at the initial review
  level was the same (*Dr. Whittle*). AR88, 901.  On reconsideration in the
  2015 analysis, *Dr. Barker* purportedly gave great weight to  *Dr. Kidman's*

consultative exam to form his opinions (AR914).  Dr. Barker opined
Mr. Larson was capable of light duty work, with the following exceptions:
he could stand/walk 6 hours out of an 8-hour day, sit 6 hours out of an
8-hour day, occasionally climb ramps, stairs, ladders, ropes, and
scaffolds.  He could occasionally stoop, kneel, crouch, and crawl.
*Dr. Barker* imposed no balancing or manipulative limitations.  AR915.

- State agency non-treating, non-examining psychological consultants
  from 2012 and 2015.  In 2012, *Stephanie Fuller, Ph. D.* found
  Mr. Larson had no severe mental impairments.  AR107.  In 2015, *Jerry
  Buchkoski, Ph. D.*, determined Mr. Larson had severe anxiety and
  affective disorders.  AR897.  *Dr. Buchkoski* opined Mr. Larson's ability to
  remember work-like procedures and short, simple instructions was not
  significantly limited, his ability to remember details was moderately
  limited as was his ability to carry out detailed instructions and his ability
  to maintain attention and concentration for extended periods.
  *Dr. Buchkoski* further opined Mr. Larson's ability to maintain a regular
  schedule and attendance or an ordinary routine was not significantly
  limited.  Nor was Mr. Larson's ability to complete a normal
  workday/workweek without interruptions from psychologically based
  symptoms, or perform at a consistent pace without an unreasonable
  number and length of rest periods.  AR901-02.  However, Mr. Larson's
  ability to interact with the public was moderately limited.  His ability to
  ask simple questions was not significantly limited, nor was his ability to
  accept simple instructions, accept criticism from supervisors, get along
  with peers or co-workers, or maintain socially appropriate behavior.
  AR902.  On reconsideration, *Dr. Soule* found these same limitations, but
  also found Mr. Larson had an additional severe impairment of an organic
  mental disorder.  AR913.

- Consulting examiners (CEs).  *Dr. Kidman* performed his consultative
  exam on March 5, 2015, and it is found at AR1456-60.  *Dr. Kidman*
  reviewed X-rays of Mr. Larson's cervical and lumbar spine.  AR1459.
  *Dr. Kidman's* assessment was chronic back pain mostly low back,
  supported by X-ray findings.  AR 1459.  *Dr. Kidman* opined Mr. Larson
  would be "unlikely to tolerate work that requires him to be on his feet, or
  requires any significant amount of bending, stooping, squatting,
  crouching, etc." AR1459. *Dr. Kidman's* report stated Mr. Larson would
  "not be able to do much in the way of lifting because of back pain . . ."
  AR1459.  *Dr. Kidman* also noted  Mr. Larson's significant findings on
  neck X-rays, chronic neck pain, and limited range of motion in the neck,
  and expressed surprise Mr. Larson did not complain of even more
  significant neck pain.  AR1459.  Finally, *Dr. Kidman* opined Mr. Larson
  had a "multi-source" sleep issue.  AR1459.  *Dr. Kidman* guessed that if
  Mr. Larson did not get help with his sleep issues, sleep deprivation would

cause "anybody" not able to sleep to be unable to focus well or have much energy on a job site. AR1460.

*Dr. Dickerson* performed his consultative examination in October, 2013. AR553. His report appears at AR553-572. *Dr. Dickerson* diagnosed dementia due to organ failure and encephalopathy as well as panic disorder with agoraphobia and dysthymia. AR563. Based Mr. Larson's general learning and verbal learning abilities, *Dr. Dickerson* did not believe Mr. Larson was capable of performing the mail sorter, DOT 209.687-027 job. AR570. This is because that job requires general learning ability and verbal learning ability equal to the middle third of the population, whereas Mr. Larson's scores in those areas fell in the bottom 10%. AR570. *Dr. Dickerson* also opined Mr. Larson would have trouble with the manual dexterity required for such a job. Id. *Dr. Dickerson* is a neuropsychologist and holds a Master's degree and Ph. D. in rehabilitation counseling psychology. AR565. His work experiences include administering more than 700 VA disability evaluations and 200 Social Security evaluations. AR 565.

*Dr. Sandbulte* performed her consultative exam in December, 2011. AR397. She issued her report in March, 2012, and it appears at AR397-403. Though *Dr. Sandbulte* opined Mr. Larson had the mental impairment of dependent personality; narcissistic personality features of self-centeredness and entitlement (AR403) she also found Mr. Larson had the "intellectual ability and sufficient thought process/memory to follow directions and learn and retain new information in an employment situation." Id. She further opined Mr. Larson had "no psychiatric or psychological issues that would interfere in his ability to be employed and/or negatively impact his activities of daily living." AR404.

The ALJ explained that he gave "some" weight to the State agency medical assessments which restricted Mr. Larson to a range of light exertional activity with additional postural limitations. AR732. The ALJ cited to both the 2011 and 2015 State agency physician medical opinions. Id. The ALJ further explained it gave "some" weight to the *physical* restrictions noted by the consultants, but that it "added *mental* limitations for the entire time period, in light of the findings from the claimant's neuropsychological evaluation concerning his dementia which developed prior to his alleged onset date, in

62

addition to his testimony regarding his daily activities and the medical evidence of record." AR733 (emphasis added).

The ALJ gave "limited" weight to Dr. Kidman's opinions. The ALJ explained it rejected Dr. Kidman's opinion that Mr. Larson could not tolerate work that required him to be on his feet or any work that required a significant amount of bending, stooping or crouching and Dr. Kidman's observation that Mr. Larson's sleep deprivation would cause him to have trouble focusing and having enough energy to perform a job. AR733. The ALJ explained the reason it assigned "limited weight" to Dr. Kidman's opinion: Dr. Kidman "performed a fairly limited examination" of Mr. Larson and more weight has been given to other medical evidence of record . . ." AR733.

The ALJ gave "more" weight to Dr. Dickerson's opinion. The "more" to which the ALJ referred was the amount of weight it assigned to Dr. Dickerson's opinion as compared to Dr. Sandbulte's opinion. The ALJ did not specifically explain what weight, if any, it assigned to Dr. Sandbulte's opinion, but noted Dr. Sandbulte had opined Mr. Larson had *no* psychological or psychiatric issues that would interfere with his ability to hold a job. AR733. Dr. Dickerson, however, had the benefit of medical records which Dr. Sandbulte did not have, and Dr. Dickerson performed other tests Dr. Sandbulte had not performed when she formed her opinions. Id. This information, according to the ALJ, "brought the nature of [Mr. Larson's] dementia into view." Id. The ALJ stated it "accepted" Dr. Dickerson's opinions regarding Mr. Larson's mental abilities, but as to his physical abilities (i.e.

dexterity) "the neuropsychological evaluation findings do not limit the claimant to occasional handling, fingering and feeling, but they do recognize problems with the claimant's ability to perform production rate processing and the use of hands when doing so.  As such, he is limited to more goal-oriented work." AR733-34.

Medical opinions are considered evidence which the ALJ will consider in determining whether a claimant is disabled, the extent of the disability, and the claimant's RFC.  See 20 C.F.R. § 404.1527.  All medical opinions are evaluated according to the same criteria, namely:

--whether the opinion is consistent with other evidence in the record;

--whether the opinion is internally consistent;

--whether the person giving the medical opinion examined the claimant;

--whether the person giving the medical opinion treated the claimant;

--the length of the treating relationship;

--the frequency of examinations performed;

--whether the opinion is supported by relevant evidence, especially medical signs and laboratory findings;

--the degree to which a nonexamining or nontreating physician provides supporting explanations for their opinions and the degree to which these opinions consider all the pertinent evidence about the claim;

--whether the opinion is rendered by a specialist about medical issues related to his or her area of specialty; and

--whether any other factors exist to support or contradict the opinion.

See 20 C.F.R. § 404.1527(c)(1)-(6); <u>Wagner v. Astrue</u>, 499 F.3d 842, 848 (8th Cir. 2007).

"A treating physician's opinion is given controlling weight 'if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.' "[9] <u>House v. Astrue</u>, 500 F.3d 741, 744 (8th Cir. 2007) (quoting <u>Reed</u>, 399 F.3d at 920); 20 C.F.R. § 404.1527(c). "A treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.' " <u>Reed</u>, 399 F.3d at 920 (quoting <u>Bentley v. Shalala</u>, 52 F.3d 784, 786 (8th Cir. 1995)). The length of the treating relationship and the frequency of examinations of the claimant are also factors to consider when determining the weight to give a

---

[9] Mr. Larson's claim was filed in 2011. The court takes a moment, however, to observe that as to claims filed with the SSA after March 27, 2017, the CFRs regarding acceptable medical sources, medical opinions, and how the SSA must articulate the way it weighs the medical evidence, has been completely re-written. <u>See</u> 20 C.F.R. §§ 614, 1520c

For example, for claims filed after March 27, 2017, though a provider must still be an acceptable medical source to provide an opinion about the existence of a medical impairment, all medical sources may provide medical opinions on other issues. The SSA, however, will not be required to articulate any particular weight (including controlling weight) assigned to the medical opinions in the file. Instead, the ALJ will consider the "persuasiveness" of all medical opinions (not only the acceptable medical source opinions) using the factors specified in the regulations. Supportability and consistency will be the most important factors, and usually the only factors the ALJ is required to articulate. <u>Compare</u>: 20 C.F.R. § 404.1520c (applicable to claims filed on or after March 27, 2017) <u>to</u> 20 C.F.R. § 1527(c) (applicable to claims filed before March 27, 2017). <u>See also</u>:
https://www.ssa.gov/disability/professionals/bluebook/revisions-rules.html
(last checked July 1, 2019).

treating physician's opinion.  20 C.F.R. § 404.1527(c).  "[I]f 'the treating physician evidence is itself inconsistent,' " this is one factor that can support an ALJ's decision to discount or even disregard a treating physician's opinion. House, 500 F.3d at 744 (quoting Bentley, 52 F.3d at 786; and citing Wagner, 499 F.3d at 853-854; Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005)).

"The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant."  Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006) (citing 20 C.F.R. §§ 404.1527)); Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)). When opinions of consulting physicians conflict with opinions of treating physicians, the ALJ must resolve the conflict.  Wagner, 499 F.3d at 849.  Generally, the opinions of non-examining, consulting physicians, standing alone, do not constitute "substantial evidence" upon the record as a whole, especially when they are contradicted by the treating physician's medical opinion.  Id.; Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999)).

However, where opinions of non-examining, consulting physicians along with other evidence in the record form the basis for the ALJ's decision, such a conclusion may be supported by substantial evidence.  Harvey, 368 F.3d at 1016.  Also, where a nontreating physician's opinion is supported by better or more thorough medical evidence, the ALJ may credit that evaluation over a

treating physician's evaluation.  <u>Flynn v. Astrue</u>, 513 F.3d 788, 792 (8th Cir.

2008) (citing <u>Casey v. Astrue</u>, 503 F.3d 687 at 691-692 (8th Cir. 2007)).

Thus, while the opinion of a treating physician is generally entitled to

more weight than that of a consulting physician, this does not mean a

consulting physician's opinion can never constitute substantial evidence in the

record.  <u>Hight v. Shalala</u>, 986 F.2d 1242, 1244 n. 1 (8th Cir. 1993).  "Indeed,

such a holding would make the provisions allowing the Secretary to require

claimants to submit to consultative exams, 20 C.F.R. §§ 404.1517-1518,

meaningless."  <u>See also</u> <u>Fisher v. Astrue</u>, 2008 WL 2559367 at *4 (W.D.  Ark.,

June 23, 2008) (ALJ's decision based upon substantial evidence consisting of

CE's opinion, claimant's testimony, and findings of the RFC assessment);

<u>Dailey v. Astrue</u>, 2009 WL 3028884 at *22-23 (D. Minn., Sept. 17, 2009).  In

<u>Dailey</u>, the court concluded the CE's opinion constituted substantial evidence

because it was the most recent opinion in the record from a mental health

provider *who actually saw the claimant* and it did not discount the opinions of

any of her *treating* physicians.  <u>Id.</u>

The ALJ must give "good reasons" for the weight accorded to opinions of

treating physicians, whether that weight is great or small.  <u>Hamilton v. Astrue</u>,

518 F.3d 607, 610 (8th Cir. 2008); 20 C.F.R. 404.1527(c)(2).

Additionally, SSR 96-8p instructs ALJs how to determine RFC and how

to explain their determinations.  That ruling contains requirements for the

ALJ's narrative discussion.  One of those requirements is that the RFC

assessment must "include a resolution of any inconsistencies in the evidence

as a whole . . ." Id. at p. 13. Another is that "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Id. at p. 14.

As noted above, this record does not contain medical opinions from Mr. Larson's treating physicians—only from consulting examiners (CE's) and non-examining, non-treating State agency physicians. Mr. Larson asserts the ALJ should have given more deference to the two physicians who actually examined Mr. Larson—Dr. Kidman and Dr. Dickerson. The court agrees.

Though these two physicians were not treating physicians, they were consulting physicians and they at least had the chance to examine Mr. Larson, unlike the State agency physicians who merely reviewed the CE's and the treating physicians' records and other records in the file to form their opinions. It is an extremely rare occasion when a physician who merely reviews the records of another physician is in a better position to form an opinion about a claimant's abilities than the physician who actually examined the claimant in the first place.

The court begins with the ALJ's discussion of Dr. Kidman's opinions. Dr. Barker, the State agency medical consultant whose opinion the ALJ gave "some" weight, indicated he gave Dr. Kidman's opinion "great" weight in forming his opinions. In reality, however, Dr. Barker completely disregarded Dr. Kidman's opinions. Recall Dr. Kidman opined Mr. Larson would be unlikely to tolerate work that required him to be on his feet, or that required

any significant amount of bending, stooping, squatting, or crouching, or lifting. But Dr. Barker's RFC indicated Mr. Larson could stand for 6 hours out of an 8-hour day, and could occasionally (up to 3 hours per day) stoop, kneel, crouch, crawl, climb stairs, ladders, ropes and scaffolds.  By giving "some" weight to the State agency opinion then, the ALJ credited an opinion which was  not supported by the evidence upon which it purported to rely.   The ALJ had a duty to reconcile the conflict, which it did not do.   Wagner, 499 F.3d at 849.

The next reason the ALJ stated for giving only "limited" weight to Dr. Kidman's opinion was that Dr. Kidman performed only "a fairly limited examination" and as a result "more weight has been given to other medical evidence of record." AR733.   The ALJ did not specify what other medical evidence upon which it relied.  Dr. Kidman's report indicates he reviewed Mr. Larson's medications, weighed him, measured his height, took his blood pressure and pulse, and assessed his vision.  AR1458-59.  Dr. Kidman surveyed Mr. Larson's range of motion in his cervical, thoracic and lumbar spine.  AR1459.  He also assessed Mr. Larson's ability to move his upper and lower extremities, his strength, and his coordination.  Id.  Dr. Kidman reviewed Mr. Larson's cervical and lumbar X-rays.  Id.

After this interview, conducting these physical assessments, and reviewing these records, Dr. Kidman made his recommendations.  Though Dr. Kidman expressed he did not believe he had adequate time to thoroughly review all of Mr. Larson's expressed complaints in depth (see AR1456), Dr. Kidman did explain he would address the complaints in order as

69

Mr. Larson perceived them from most disabling to least disabling, and would leave the mental impairment complaints for evaluation by a mental health professional.  Id.

Dr. Kidman also recommended a neuropsychological evaluation should be conducted to evaluate the degree to which some of Mr. Larson's symptoms such as memory loss and concentration difficulties might be related to previous brain damage, since those types of problems might be caused by something other than just sleep deprivation.  AR1460.[10]

The ALJ stated he did not give any more weight to Dr. Kidman's opinion because Dr. Kidman's examination was "fairly limited."  To the extent that is true, in this case it does not constitute a "good reason" for failing to give more weight to Dr. Kidman's opinion.  As in Dailey there were not a lot of choices in this record for opinion evidence from physicians who had *actually examined the claimant.*  The only other medical opinions in the record were from the State agency physicians who had never examined or treated Mr. Larson at all (and as explained above, their opinions purportedly gave great weight to Dr. Kidman's findings but in reality did not, but that conflict was not resolved by the ALJ) or the from other consultative examiner—Dr. Dickerson—whose opinion the ALJ also failed to credit.

Given the record as a whole, this court cannot conclude the ALJ gave "good" reasons for the limited deference it afforded to Dr. Kidman's opinion.

---

[10] A neuropsychological exam was conducted by Dr. Dickerson in 2013. It does not appear Dr. Kidman was provided with those records for review.

Hamilton  518 F.3d at 610; 20 C.F.R. 404.1527(c)(2).   For this reason as well, the ALJ's formulation of the RFC is not supported by substantial evidence and this case must once again be remanded to the SSA for further consideration.

The ALJ gave "more" weight to Dr. Dickerson's opinion than it did to Dr. Sandbulte's opinion, but the ALJ failed to credit Dr. Dickerson's manipulative limitations.  AR733-34.  For example, Dr. Dickerson specifically commented upon the previous determination that Mr. Larson was capable of the mail sorter (DOT # 209.687-027) position.   Dr. Dickerson stated that based upon the testing performed by him, Mr. Larson did not have the learning ability, motor coordination, or finger and manual dexterity necessary to perform a job that would require frequent reaching, handling and fingering.  AR570.   But the ALJ rejected Dr. Dickerson's findings about Mr. Larson's motor coordination and finger/manual dexterity, stating "the neuropsychological evaluation findings do not limit the claimant to occasional handling, fingering, and feeling, but they do recognize problems with the claimant's ability to perform production rate processing and the use of the hands when doing so."  AR733-34.

But  Dr. Dickerson's report *does* so limit Mr. Larson.  Mr. Larson cites Dr. Dickerson's report (AR553-72) which, among other things, explains Mr. Larson's scores on portions of the Wechsler Adult Intelligence Scale 4 and Halstead Reitan Tactual Performance (TPT) tests administered by Dr. Dickerson.  Specifically, Mr. Larson cites AR570 which appears to have been only partially copied in the administrative record.  The portion that is

71

missing in the administrative record has been supplied by Mr. Larson's counsel at Docket 15-1. It contains Dr. Dickerson's interpretation of those tests and Mr. Larson's poor performance on them (i.e. poor motor coordination, finger dexterity and spatial aptitude) which Dr. Dickerson explains disqualifies Mr. Larson from the mail sorter job. Docket 15-1.

In brief, the Commissioner acknowledges the ALJ rejected Dr. Dickerson's manipulative findings based upon the testing Dr. Dickerson performed, because the ALJ deemed those tests not "physical exam findings." But Dr. Dickerson's explanation of that portion of the Wechsler Adult Intelligence Scale test (Symbol Search and Coding) indicates that it tests for motor coordination, finger dexterity and manual dexterity. <u>See</u> Docket 15-1. There is no opinion evidence in the record contradicting that explanation, or validity of these test results.

The Commissioner cites the opinions of Drs. Whittle, Barker and Erickson, for the proposition that the ALJ's imposition of manipulative restrictions less restrictive than those imposed by Dr. Dickerson are appropriate. But these opinions were all offered by State agency physicians who never examined Mr. Larson. <u>See</u> AR 97-98 (Dr. Whittle); 109 (Dr. Erickson); 914-16 (Dr. Barker). The opinions of physicians who have not examined the claimant ordinarily do not constitute substantial evidence on the record. <u>Nevland</u>, 204 F.3d at 858.

This court agrees with Mr. Larson in finding the ALJ erred by rejecting Dr. Dickerson's recommendation regarding Mr. Larson's manipulative

limitations.  Dr. Dickerson's report explains that portion of his testing upon which this recommendation was made; there is no indication Dr. Dickerson was not qualified to administer said test.  No other treating or examining physician in the record offered differing limitations.  For these reasons, the ALJ's rejection of Dr. Dickerson's manipulative limitations, and therefore its RFC formulation, is not based upon substantial evidence in the record as a whole.

### c. Mr. Larson's Alleged Non-Compliance With Medical Advice

In its decision, the ALJ discussed Mr. Larson's diabetic condition and noted in several places that Mr. Larson experienced problems and symptoms due to his own lack of compliance with his diet, counting carbohydrates, testing his blood sugars, etc.  See e.g. AR732.  In summarizing Mr. Larson's RFC, the ALJ emphasized that the RFC formulation was supported by Mr. Larson's "spotty compliance with diabetic treatment" among other factors.  AR734.  In his initial brief, Mr. Larson claims this was error, citing a new Social Security Ruling (SSR) which was implemented in 2018 (SSR 18-3p). In his reply brief, Mr. Larson concedes SSR 18-3p does not apply because the ALJ issued its decision in 2017.  Therefore, Mr. Larson argues, the rules which were applicable before SSR 18-3p went into effect were applicable.  Mr. Larson asserts even under those rules, the ALJ erred.

With regard to a claimant's infrequency of treatment or failure to follow prescribed treatment, the Commissioner's own rulings instruct that it will not find this factor to be contrary to the claimant's described symptoms unless the

Commissioner first contacts the claimant for an explanation regarding lack of treatment, or asks the claimant for such an explanation at the ALJ hearing. See SSR 16-3p. The Commissioner specifically acknowledges a claimant may not seek treatment or may not follow prescribed treatment because he "may not be able to afford treatment and may not have access to free or low-cost medical services." Id. The Commissioner further teaches it is not enough for an ALJ to recite the [Polaski] factors. Id. Instead, the ALJ's opinion "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Id.

The Commissioner has provided even more refined guidance for evaluating a claimant's failure to follow prescribed treatment. See SSR 82-59. When the Commissioner determines a claimant has failed to follow prescribed treatment, the Commissioner must also determine whether the failure to follow treatment was justifiable. Id. The treatment prescribed must be expected to restore the claimant's ability to work. Id. As with SSR 16-3p, the Commissioner promises in SSR 82-59 to give the claimant an opportunity to explain why he has not followed her doctor's advice and why that is important to the disability determination process:

> The claimant . . . should be given an opportunity to fully express the specific reason(s) for not following the prescribed treatment. Detailed questioning may be needed to identify and clarify the essential factors of refusal. The record must reflect as clearly and accurately as possible the claimant's . . . reason(s) for failing to follow the prescribed treatment.

Individuals should be asked to describe whether they understand the nature of the treatment and the probable course of the medical condition (prognosis) with and without the treatment prescribed. The individuals should be encouraged to express in their own words why the recommended treatment has not been followed. They should be made aware that the information supplied will be used in deciding the disability claim and that, because of the requirements of the law, continued failure to follow prescribed treatment without good reason can result in denial or termination of benefits.

Id.

Depending on the claimant's explanation, the Commissioner counsels that it may be necessary to recontact the treating medical source to substantiate or clarify what the source told the claimant. Id. There are several claimant explanations for failing to follow recommended treatment that the Commissioner identifies as justifiable reasons. Id. Among those are inability to afford the treatment and lack of free community resources. Id. [11]

Where an ALJ believes a claimant does not have justifiable reasons for refusing recommended treatment, the ALJ is supposed to advise the claimant *before* a determination of eligibility of benefits is decided; that way, the

---

[11] In brief, Mr. Larson hints that his diabetes was more difficult than usual to control due to the complex nature of his particular type of diabetes in combination with his organically caused dementia. In other words, he suggests he simply was not mentally capable of calculating the necessary carbohydrates and insulin to carbohydrate ratios in order to keep his diabetes under good control. See Docket 15, pp. 18-19. This too should be explored on remand, as the acceptable reasons for non-compliance listed in SSR 82-59 were non-exclusive.

The court notes that because this matter is being remanded, the new SSR (18-3p) will be applicable on remand. That regulation as well indicates the reasons cited as acceptable for non-compliance are non-exclusive.

claimant can elect to undergo the treatment if desired.  Id.  This prophylactic measure is necessary for fundamental fairness because, once a disability application is denied, the claimant may not later undertake to follow the treatment recommendation and revise the adverse determination.  Id.  An ALJ may consider whether an examining medical source determines that the claimant was malingering in assessing the credibility of the claimant's testimony as to subjective complaints of pain.  Clay v. Barnhart, 417 F.3d 922, 930 n.2 (8th Cir. 2005) (two psychologists' findings that claimant was "malingering" cast suspicion on the claimant's credibility).

The court has carefully reviewed the November 22, 2016, ALJ hearing transcript which appears at AR783-821.  There is a very brief discussion between the ALJ and Mr. Larson about Mr. Larson's diabetic condition at AR796-98.  The ALJ asked how often Mr. Larson checked his blood sugars, what Mr. Larson's blood sugars normally ran when he did check them, and what effects Mr. Larson suffered when his blood sugars ran high.  Id.  But the ALJ did not follow up on Mr. Larson's answers to those questions with any inquiry about whether Mr. Larson's high blood sugars were a result of his failure to follow his physicians' recommended treatment—whether it be medication, diet, or any other physician-recommended method to keep Mr. Larson's diabetic condition well-controlled.  Nor did the ALJ inquire why Mr. Larson did not comply with his physicians' recommendations, if in fact that was the reason for his high blood sugars.  Id.  This brief on-the-record discussion about Mr. Larson's diabetic condition wholly fails to comply with the

Commissioner's own standard for evaluating a claimant's failure to follow prescribed advice as it pertains to credibility and formulating the RFC. Remand is required as to this assignment of error as well.

**2.      The ALJ's Step 5 Determination**

At step 5, the ALJ found there were other jobs Mr. Larson could perform within the RFC as formulated by the ALJ.  AR734-35.  The ALJ's conclusion was based on testimony from the VE that there were 64,000 garment sorter, 125,000 laundry worker, and 500,000 hotel housekeeper jobs available "nationally."  AR735.  By testifying to the number of jobs available in the entire United States, Mr. Larson alleges the VE and the ALJ used the wrong standard. His argument is based on statutory language.

Section 423(d) of Title 42 provides in pertinent part as follows:

(d) "Disability" defined

(1)The term "disability" means—
   (A) Inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months;

* * *

(2) For purposes of paragraph (1)(A)—
      (A) An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. ***For purposes of the***

> ***preceding sentence*** (with respect to any individual),
> ***"work which exists in the national economy"***
> ***means work which exists in significant numbers***
> ***either in the region where such individual lives or***
> ***in several regions of the country.***

<u>See</u> 42 U.S.C. § 423(d)(1)(A) and (2)(A) (emphasis added).

What is clear from the above emphasized language is that "work which exists in the national economy" is a term of art in Social Security law. It does not mean work in the entire United States. Instead, it means "work which exists in significant numbers either in the *region* where such individual lives or in *several regions* of the country." <u>Id.</u> (emphasis added). Now, what does that definition mean exactly?

The Commissioner cites cases which seize upon the language in the statute which says it need not establish jobs exist in the claimant's *immediate area.* Yes. That is true, but it begs the question. The Commissioner *does* have to show that jobs exist in Mr. Larson's "region" or in "several regions of the country." We know from the statutory language that "region" does *not* mean "immediate area," but defining what a term does not mean is not all that helpful in defining what it *does* mean.

The Commissioner's regulation, 20 C.F.R. § 404.1566, is likewise unhelpful. It does not define "region." <u>Id.</u> It says that "region" is not equal to "immediate area." <u>Id.</u> at (a)(1).

To adopt the Commissioner's position—a position repeatedly asserted before this court in a number of Social Security appeals—would be to disregard a portion of the statutory language. The statute states clearly ***" 'work which***

78

**exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."** 42 U.S.C. § 423(d)(2)(A).

The Commissioner would have this court ignore this plain statutory mandate.  This, the court cannot do for the Supreme Court teaches that every provision of a statute must be given effect when construing it:  where a statute can be interpreted so as to give effect to all portions of the statute, that interpretation must prevail over an interpretation that nullifies some portion of the statute.  Morton v. Mancari, 417 U.S. 535, 551 (1974).  "If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 665 (2007) (quoting Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984)).

Congressional intent is clear:  the Commissioner *does* have to show that jobs exist in Mr. Larson's "region" or in "several regions of the country."  42 U.S.C. § 423(d)(2)(A).  We know from the statutory language that "region" does *not* mean "immediate area."  Id.  The Commissioner's regulation likewise does not define "region," but only says that "region" is not equal to "immediate area."  20 C.F.R. § 404.1566(a)(1).

In Barrett v. Barnhart, 368 F.3d 691, 692 (7th Cir. 2004), the court held the "other regions" language that Congress used in § 423(d)(2)(A) was intended to prevent the Social Security Administration from denying benefits on the

basis of isolated jobs existing only in very limited numbers in relatively few locations outside the claimant's region.  This sentiment is paralleled in the Commissioner's regulation where it states:  "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered 'work which exists in the national economy.'  We will not deny you disability benefits on the basis of the existence of these kinds of jobs."  20 C.F.R. § 404.1566(b).

The dictionary defines "region" as "a large, indefinite part of the earth's surface, any division or part."  Webster's New World Dictionary, at 503 (1984).  "A subdivision of the earth or universe."  OED (3d ed. Dec. 2009).  We know from Congress' statute and from the Commissioner's regulation, that "region" does not mean the entire country.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 1566(b).  The dictionary defines "region" as an indefinite parcel that is part of the whole, and so must be something less than the whole.  The court concludes, as it must, that "nationwide" does not truly mean "nationwide."  Such is the nature of agency law.  Instead, at Step 5, the ALJ must find that jobs the claimant can do exist in substantial numbers in the claimant's own "region" (something less than the whole nation), or in "several regions" (several parts that, together, consist of something less than the whole nation).  Id.

The Commissioner cites Johnson v. Chater, 108 F.3d 178 (8th Cir. 1997), in support of the assertion that in the Eighth Circuit, "nationwide" does mean the entire country.  But that is not what Johnson says.  In the Johnson case, the claimant appealed the issue whether the VE's testimony was

sufficient to prove that there were jobs existing in substantial numbers in the national economy. Id. at 178. The VE had testified that Johnson could perform sedentary, unskilled work such as being an addresser or document preparer. Id. at 179. The VE said that there were 200 such positions in Iowa and 10,000 such positions nationwide. Id. Johnson took issue with whether 200 positions in his home state of Iowa constituted "substantial" numbers of jobs. Id. at 180 n.3. The court rejected Johnson's argument and held that the VE's "testimony was sufficient to show that there exist a significant number of jobs in the economy that Johnson can perform." Id. at 180.

The facts in Johnson stand in stark contrast to the facts in Mr. Larson's case. In Johnson, the VE testified to the number of jobs available in the claimant's *region* (in that case, his state), and also the number of jobs available in the whole country. Id. at 179. Here, the VE testified *only* to the number of jobs available "in the United States." AR735, 818. As established above, both § 423(d)(2)(A) and § 404.1566 require more specificity than that. The ALJ and the VE must find that substantial numbers of jobs are available in Mr. Larson's region or in several regions. See Harris v. Barnhart, 356 F.3d 926, 931 (8th Cir. 2004) (the ALJ must find at step five that claimant is "capable of performing work that exists in significant numbers within the *regional and national* economies.") (emphasis added).

The Commissioner also cites Matthews v. Eldridge, 424 U.S. 319, 336 (1976); Whitehouse v. Sullivan, 949 F.2d 1005, 1007 (8th Cir. 1991); Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997); and Weiler v. Apfel, 179 F.3d 1107,

1110-11 (8th Cir. 1999) for the proposition that the rule requires only that the Commissioner show appropriate jobs that exist in the national economy. The court has carefully examined each of these cited cases. While it is true each case proclaims the Commissioner must show that jobs exist in the national economy which the claimant can perform, none of them put a fine point on the precise meaning of that term of art, as explained above.

Instead, for example, in <u>Matthews</u> the court merely cited the "immediate area" language of 42 U.S.C. § 423(d)(2)(A) for the proposition that the Commissioner need not find a specific job vacancy in the claimant's "immediate area." <u>Matthews</u>, 424 U.S. at 336.[12] The Court noted in footnote 14, however, that the term "national economy" was further defined by reference to a region or several regions. <u>Id.</u> at n. 14.

In <u>Whitehouse</u>, the court cited the general proposition that the VE must find jobs the claimant can perform in the national economy, but did not discuss the meaning of that term as it is used in the statute. <u>Whitehouse</u>, 949 F. 2d at 1007. The same is true in <u>Weiler</u>. <u>See</u> <u>Weiler</u>, 179 F.3d at 1111.

In <u>Long</u>, the court quoted the general proposition required by 42 U.S.C. § 423(d)(2)(A) that the Commissioner needs to find jobs available in the "national economy," but in that case, the VE specifically stated it had found jobs in the specific state where the claimant lived (Iowa). <u>Long</u>, 108 F.3d at

_____

[12] For the reasons already explained on pages 79-80 of this opinion, that the Commissioner does not have to establish jobs which exist in Mr. Larson's "immediate area" does not end the inquiry about whether the Commissioner has met her burden to show jobs exist in the "national economy" as that term is used in the statutes and regulations.

188.  Long, therefore, does not support the concept that the term "national economy" does not require the commissioner to consider any geographical area smaller than the entire United States.

The burden on is on the Commissioner at Step 5 of the sequential analysis.  Johnson, 108 F.3d at 180.  Therefore, the absence of valid evidence of substantial numbers of jobs in Mr. Larson's "region" or in "several regions" is an absence of evidence that cuts against the Commissioner.  While this court might hazard a guess that there are substantial numbers of laundry worker, garment sorter, and hotel housekeeper jobs available in South Dakota, or in the region consisting of South Dakota, North Dakota, Minnesota, Iowa, and Nebraska, or in several other regions in the country, this court is not allowed to guess about facts that might have been able to have been adduced at the agency level.  The failure of proof required at this Step is another reason this case requires reversal and remand.

**H.    Type of Remand**

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Mr. Larson requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider his case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration.  It authorizes two types of remand orders: (1) sentence four

remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling.  Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings.  Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding."  Buckner, 213 F.3d at 1011.  In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings.  Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be developed, clarified and properly evaluated.  See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all

factual issues have been resolved and the record supports a finding of disability).

## CONCLUSION

Based on the foregoing facts, law and analysis, it is hereby ORDERED that Mr. Larson's motion to reverse the decision of the Commissioner [Docket No. 14] is granted. This matter is remanded to the Commissioner pursuant to sentence four, 42 U.S.C. § 405(g), for further proceedings in accordance with this order.

DATED this 15th day of August, 2019.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge